**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Gary D. Martin,**
**Petitioner Below, Petitioner**

**vs)   No. 17-0116** (Fayette County 16-C-156-H)

**Ralph Terry, Acting Warden,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**June 29, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

Petitioner Gary D. Martin, by counsel Kelly C. Pritt, appeals the January 17, 2017, order of the Circuit Court of Fayette County denying his petition for writ of habeas corpus.[1] Respondent Ralph Terry, Acting Warden, Mt. Olive Correctional Complex,[2] by counsel Shannon Frederick Kiser, filed a summary response and then a supplemental summary response in support of the circuit court's order. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On April 22, 2008, a jury found petitioner guilty of two counts of first-degree murder and one count of second-degree murder. With regard to petitioner's first-degree murder convictions,

---

[1]Although Attorney Pritt was appointed to represent petitioner in this appeal and filed a brief on his behalf, she was later permitted to withdraw as petitioner's counsel and petitioner was allowed to proceed pro se. By amended scheduling order entered November 14, 2017, this Court granted petitioner's motion to file a supplemental brief, which was previously filed on September 28, 2017.

[2]Since the filing of the appeal in this case, the warden at Mount Olive Correctional Complex has changed and the acting warden is now Ralph Terry. The Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

1

the jury made recommendations of mercy. On June 2, 2008, the circuit court sentenced petitioner to two life terms of incarceration, with the possibility of parole, for his first-degree murder convictions and to a determinate term of forty years of incarceration for his second-degree murder conviction. The circuit court ordered that petitioner serve his sentences consecutively. Petitioner sought review of his convictions and sentences before this Court, which refused his appeal by order entered April 4, 2009.

On May 27, 2016, petitioner filed a petition for writ of habeas corpus, alleging twenty-two grounds for relief. In a comprehensive order entered January 17, 2017, the circuit court grouped petitioner's grounds into three categories: (1) grounds based on the actions of the prosecution; (2) grounds based on the actions of the circuit court; and (3) grounds alleging ineffective assistance by petitioner's trial attorneys. The circuit court noted that "[t]he undersigned [j]udge, having presided over . . . [p]etitioner's underlying criminal case from arraignment, pre-trial hearings, jury trial, to sentencing, is thoroughly familiar with all proceedings in said case." Having carefully reviewed the "case file, including trial transcripts," the circuit court "conclude[d] that the relevant facts of the case *sub judice* have been sufficiently and adequately developed and that the [c]ourt can now rule upon the [p]etition as a matter of law without a hearing." The circuit court found that petitioner's grounds for relief were without merit and denied his habeas petition.

Petitioner now appeals the circuit court's January 17, 2017, order denying habeas relief. We apply the following standard of review in habeas appeals:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, of *Anstey v. Ballard*, 237 W.Va. 411, 787 S.E.2d 864 (2016).

On appeal, petitioner argues that the circuit court erred in denying his habeas petition without a hearing and appointment of counsel. Respondent counters that the circuit court properly denied the petition. We agree with respondent. As we held in syllabus point three of *Anstey*:

> "'A court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief. Syllabus Point 1, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973).' Syl. Pt. 2, *White v. Haines*, 215 W.Va. 698, 601 S.E.2d 18 (2004)."

237 W.Va. at 412, 787 S.E.2d at 866.

Petitioner points out that, in *State ex rel. Watson v. Hill*, 200 W.Va. 201, 205, 488 S.E.2d 476, 480 (1997), we directed the circuit court to hold a hearing on a habeas petitioner's ineffective

2

assistance of trial counsel claim. However, in *Watson*, we indicated that a hearing might not have been ordered if the circuit court had made findings adequate to show that petitioner's claim would have failed under the applicable *Strickland/Miller* standard for ineffective assistance,[3] stating that "[i]f that was the court's reasoning, it should have been included in the order[.]"*Id.* at 204, 488 S.E.2d at 479. Here, we find that the circuit court made extensive and detailed findings establishing that the record from the underlying criminal case was sufficiently developed to show petitioner's eight claims of ineffective assistance lacked merit. Therefore, we conclude that, under the facts and circumstances of this case, a hearing on those claims was not necessary.

Petitioner further argues that the circuit court judge who presided over his criminal case should not have presided in his habeas proceeding given that the judge would be reviewing his own rulings. We find that petitioner's argument is contrary to longstanding and well-reasoned West Virginia precedent. As we found in *Hill*, a judge who presided in the criminal case "is sufficiently familiar with the underlying proceedings to determine most of the issues presented by the [p]etitioner without a hearing." *Id.* Here, we find that the circuit court noted that "[t]he undersigned [j]udge . . . presided over . . . [p]etitioner's underlying criminal case from arraignment, pre-trial hearings, jury trial, to sentencing" and also carefully reviewed the "case file, including trial transcripts." Therefore, we conclude that there was no issue on which it was necessary for the circuit court to hold a hearing.

Finally, petitioner argues that the United States and West Virginia Constitutions require the appointment of counsel in habeas cases. We reject this argument as contrary to syllabus point three of *Anstey*. As the Supreme Court of the United States reiterated in *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), as a matter of constitutional law, "there is no right to counsel in collateral proceedings." Therefore, we conclude that the circuit court did not abuse its discretion in denying petitioner's habeas petition without a hearing and appointment of counsel.

Having reviewed the January 17, 2017, "Order," we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to all of the assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED**:   June 29, 2018

---

[3] In West Virginia, claims of ineffective assistance of counsel are governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires the following: (1) counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See* Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) (adopting *Strickland*).

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

Justice Allen H. Loughry II, suspended and therefore not participating.



MAY 17 2018

EDYTHE NASH GAISER
SUPREME COURT
CLERK

# IN THE CIRCUIT COURT OF
# FAYETTE COUNTY, WEST VIRGINIA

17-0116

GARY D. MARTIN,

    Petitioner,

vs.                                  CIVIL ACTION NO. 16-C-156-H

DAVID BALLARD, Warden,
MT. OLIVE CORRECTIONAL COMPLEX,

    Respondent.

2017 JAN 17 P 2: 42
FAYETTE COUNTY
CIRCUIT CLERK

# ORDER

On May 27, 2016, Inmate Petitioner Gary D. Martin (hereinafter "Petitioner") *pro se*, filed a Petition seeking a Writ of Habeas Corpus, thereby instituting the above-styled civil action, in regard to his convictions for two counts of murder in the first degree, with mercy, and one count of murder in the second degree, and the sentences imposed in Petitioner's underlying criminal case, Indictment No. 07-F-159-H. In said Petition, Petitioner raised twenty-two (22) grounds for relief as follows: two (2) Grounds claiming that the prosecution abused its direction as follows: "the prosecution abused its discretion by 'constructively blocking' the Grand Jurors from properly investigating and fully confronting the evidence in this case;" Ground Ten: "the prosecution abused its discretion by failing to properly preserve the crime scene, properly collect the crime scene evidence, and by mishandling purported evidence...;" twelve (12) Grounds (Grounds Six, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, and Twenty-Two) claiming that the trial court abused its direction. Those twelve (12) grounds are as follows: Ground Six: "The trial court failed to grant a change of venue based upon excessive pre-trial publicity and possible jury intimidation by family members of the victims, in direct violation of West Virginia Constitution, Article III, § 10 and 14 and United States Constitution, Amendments 5 and 14"; Ground Eleven: "The trial court improperly admitted evidence that did not have a proper foundation or chain of custody established"; Ground Twelve: "The trial court gave an incorrect, burden shifting element instruction for

voluntary manslaughter in the case of Mr. Dustin Hughes [victim], which also omitted a necessary element, denying Petitioner due process and equal protection of law"; Ground Thirteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Dustin Hughes [victim], which also omitted a necessary element, denying Petitioner due process and equal protection of law"; Ground Fourteen: "The trial court gave an incorrect burden shifting element instruction for first degree murder in the case of Mr. Dustin T. Hughes [victim], which also omitted two necessary elements denying Petitioner due process and equal protection of law"; Ground Fifteen: "The trial court gave an incorrect burden shifting element instruction when instructing for voluntary manslaughter in the case of Mr. Christopher L. Legg [victim], denying Petitioner due process and equal protection of law"; Ground Sixteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Christopher L. Legg [victim], which also omitted a necessary element denying Petitioner due process and equal protection of law"; Ground Seventeen: "The trial court gave an elementally incorrect instruction when instructing for first-degree murder in the case of Mr. Christopher L. Legg [victim], which also omitted two necessary elements denying Petitioner due process and equal protection of law"; (9) Ground Eighteen: The trial court gave an incorrect burden shifting element instruction when instructing for voluntary manslaughter in the case of Mr. Carl B. Cox, Jr. [victim], denying Petitioner due process and equal protection of law"; Ground Nineteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Carl b. Cox, Jr. [victim], which also omitted a necessary element denying Petitioner due process and equal protection of law;" Ground Twenty: The trial court gave an incorrect burden shifting elemental instruction when instructing for first-degree murder in the case of Mr. Carl B. Cox, Jr. [victim], which also omitted two necessary elements denying Petitioner due process and equal protection of law"; and Ground Twenty-Two: "The trial court deliberately negated or voided the jury "mercy" finding by running the sentences consecutive instead of concurrent as plainly the jury had found." Petitioner also raised eight (8) Grounds claiming ineffective assistance of counsel. Those eight (8) grounds are as follows: Ground Two: Trial counsel failed to raise to the Court's attention and request pre-trial psychological evaluation of Petitioner where it was known that Petitioner likely suffered post-traumatic stress disorder at the time of the crime and at the time of the trial; Ground Three: Trial counsel did not request a

2

continuance to permit Petitioner to have his competence as to his ability to stand trial in the first place, and to see if his competence could be restored for trial; Ground Four: Trial counsel did not investigate the Jury Pool for information that would have provided a basis for challenges for cause which denied Petitioner a jury free of bias; Ground Five: Trial counsel were ineffective in conducting *voir dire* of the prospective jurors and sitting jurors in this case, ... and but for their shortcoming in *voir dire*, the results of the proceedings would have been different; Ground Seven: Trial counsel failed to hire crime scene expert, physical logistics expert, firearms expert and psychologist to refute the State's experts and the State's evidence; Ground Eight: Trial counsel failed to raise to the Court that Petitioner was unable to hear all of counsels questions, misunderstood many questions, could not effectively communicate with counsel without his medically proscribed hearing aids were burned-up during the house fire two days after his arrest; Ground Nine: Trial counsel failed to adequately prepare Petitioner to testify on his own behalf; and Ground Twenty-One: Trial counsel failed to raise the infirmities in the trial court's instructions raised in Grounds Twelve to Twenty, therefore mentioned."

The Court has conducted a preliminary review of the Petition pursuant to Rule 4 of the Rules Governing Post-Conviction Habeas Corpus Proceedings. The Court, after full consideration and review of the Petition, relevant law, complete contents of the Court file in Petitioner's underlying criminal case, including the pre-trial and jury trial transcripts, now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The undersigned Judge, having presided over the aforementioned Petitioner's underlying criminal case from arraignment, pre-trial hearings, jury trial, to sentencing, is thoroughly familiar with all proceedings in said case. The Court is also very familiar with all of the Inmate Petitioner's post-conviction proceedings concerning the aforementioned criminal case.

2. On September 12, 2007, a Fayette County Grand Jury returned a true bill of Indictment No. 07-F-159, charging Petitioner with one (1) count of murder of Dustin T. Hughes (hereinafter "Hughes") with the use of a firearm, one (1) count of murder of Christopher L. Legg (hereinafter "Legg") with the use of a firearm, and one (1) count of murder of Carl B. Cox, Jr. (hereinafter "Cox") with the use of a firearm. The grand jury charged the felony crimes of

3

murder but left the determination of the degree of murder, if any, to a trial jury by not specifying any degree of murder within the Indictment. Such charging has been the common practice in Fayette County for many years.

3. On September 20, 2007, an arraignment hearing as to the aforementioned Indictment was conducted, whereat Petitioner, appeared in person and with counsel, W. Edward Rebrook III and Michael T. Clifford, both attorneys being very experienced criminal defense lawyers, who were employed by Petitioner. At said arraignment, Petitioner was given a copy of the indictment and informed of the charges against as contained therein, and he then entered pleas of not guilty to each of the aforementioned charges. At said arraignment, counsel for Petitioner orally moved the Court to relocate Petitioner from the Southern Regional Jail to the South Central Regional Jail for Petitioner's safety concerns and convenience to communicate with counsel, both of whom lived in Charleston, West Virginia. The Court, upon consideration of the representation of Petitioner's counsel and the response from the State of West Virginia (hereinafter "State"), granted said relocation motion.

4. At the aforementioned arraignment, the counsel for Petitioner also orally moved the Court to continue Petitioner's trial to the January, 2008 Term of Court due to their having several criminal jury trials already scheduled in Putnam County Circuit Court during the September, 2007 Term of Court. The Court granted said Motion by an Order entered October 1, 2007. Petitioner, at the aforementioned arraignment, waived his right to a speedy trial. The record shows that Petitioner had no trouble understanding the Court's questions, understanding his counsel's answers, or communicating with his counsel as shown below:

The Court: **you are Gary D. Martin, sir?**
The Defendant/Petitioner: **Yes, sir.**
The Court: All right, sir, you are here with your lawyer, Ed, Rebrook, Correct?
The Defendant: Yes, sir, that's correct.
The Court: Mr. Martin, the Fayette County Grand Jury, sitting at its September term, has returned as to [sic] three count indictment against Gary D. Martin. It is Indictment 01-F-159. ... Are you the same Gary D. Martin named within this indictment, sir?
The Defendant: Yes, sir.
Mr. Rebrook: I have explained to Mr. Martin that he has a right to be tried in the term in which he was indicted. I also explained to Mr. Martin that Mr. Clifford and I have another huge murder trial we're working on right now in Putnam County before Judge Glosky [sic] that starts December, the very first week of December. I told Mr. Martin because of the severity of his crime, the number of

4

victims, number of potential witnesses, we would ask to move this matter into your January term.

The Court: I'll question the Defendant now about that. I'll take your motion under advisement... Mr. Martin, do you understand that you have the right, by constitution, to a speedy trial, that is to have this case tried [on Friday. November 30, 2007, at 9:00 a.m.,] I just announced or sooner. Do you understand that?

The Defendant: Uh-huh.

The Court: You have to answer loud.

The Defendant: Yes, sir.

The Court: And Mr. Rebrook says that he and his associate, Mr. Clifford, who are your lawyers... need more time to work with you and investigate your case and study all of the documents, whatever it is the State will give them, and that he would not be sufficiently ready on, in November to try your case. Do you agree with that?

The Defendant: Yes, sir.

Indictment No. 07-F-159 Arraignment and Motions Hearing Transcript, pp 2-8 (emphasis added).

5. On September 20, 2007, Petitioner, by counsel, filed a pleading captioned "Motion for Change of Venue," alleging that the venue of this case should be changed to either the northern panhandle or the eastern panhandle of West Virginia, because "the [Petitioner's] family has been threatened by numerous people, ... the [Petitioner's] house was burned down, presumably by relatives of the deceased" due to the triple homicide allegedly committed by Petitioner, and "no amount of security can assure and insure the reasonable safety of the [Petitioner], his family, his witnesses, his counsel, and perhaps the Court officers in a trial and other court proceedings in Fayette County." Carl L. Harris, Fayette County Prosecuting Attorney, filed a pleading captioned "Response to Motion for Change of Venue," on October 3, 2007, stating, in relevant part, that:

The safety of the [Petitioner] and his witness can and will be as well protected in Fayette County, West Virginia, as it can be in any other jurisdiction within the State of West Virginia.
There is no hostile sentiment against the accused which extends throughout Fayette County.
A fair and impartial Fayette County jury was able to be chosen in two prominent cases each of which generated publicity which equals that of his case, ... a substantial interest by the news media, in and of itself is not a reason to move the case from Fayette County.

6. On September 20, 2007, Petitioner, by counsel, also filed a pleading captioned "Motion for Hearing on the Issue of Bond," requesting the Court to "schedule a hearing at which [Petitioner] can present witnesses in support of his being released on bond." Carl L. Harris,

Fayette County Prosecuting Attorney, filed a pleading captioned "Response to Motion for Bond," on October 3, 2007, stating, in relevant part, that:

> The [Petitioner] was armed with a semi automatic rifle, an AK 47, variant, and he owned numerous similar weapons and other types of firearms which were located within his residence, many of which were removed before the house burned.
> The [Petitioner's] conduct and statements after the incident would indicate no remorse for the deaths and even some pride in that he had "done it right" and there was no need to check the bodies to see if any of the three were still alive.

7. On October 1, 2007, the Court entered an Order scheduling a bond hearing for Friday, October 12, 2007. Subsequently, on October 10, 2007, Petitioner, by counsel, filed a pleading captioned "Motion for Continuance of Hearing on the Issue of Bond," seeking the continuance, generally, of said October 12, 2007 bond hearing, which was granted by the Court by an Order entered on October 10, 2007.

8. The jury trial was scheduled for February 5, 2008 by an Order entered October 1, 2007, and on December 12, 2007, the Court mailed counsel for Petitioner and the State, letters requiring them to provide the Court with all of their proposed *voir dire* questions no later than 12:00 noon, Friday, January 25, 2008.

9. On January 4, 2008, a hearing was conducted, whereat, the State and Petitioner, by the aforementioned counsel respectively, orally filed a joint motion to continue the jury trial. The Court granted said motions based upon good cause shown by the parties and the jury trial was scheduled to commence Friday, April 18, 2008 at 9:00 a.m., by an Order entered January 16, 2008. Also at said hearing, the Court took up the aforementioned Motion for Change of Venue. Upon consideration of the arguments of counsel that there would be better security for the trial in another location, the Court denied said Motion because the Court opinioned that adequate security would be provided in Fayette County. The Court then, at said hearing, took up the aforementioned Petitioner's Motion for Bond. Petitioner, by counsel, tendered into the Court and asked leave to file twenty-one (21) original notarized letters from "various civic leaders, religious leaders, community leaders and fraternal leaders, along with members of [Petitioner's] family, who are encouraging [the Court] in those letters to look favorably upon [Petitioner's] request for bond." Transcripts of the Motion Hearing, on Friday, January 4, 2008, p 11. One of those twenty-one (21) letters written in January 2008 was written by Paul B. Dobbins Jr., stating, in relevant part that: "I have known Gary D. Martin for almost 20 years, and have found him to be very personable and friendly. ... [Petitioner] has been a

6

hard working provider for his family, and fastidious in providing them with the comforts and necessities to be happy and industrious." Letter to Trial Judge from Paul B. Dobbins Jr. PO Box 651 Ansted, West Virginia 25812. Petitioner's wife, Debra L. Martin, wrote stating, in relevant part, that:

> [Petitioner] is a wonderful father to our three children, and has handled much of the parenting over the past six or seven years, since he retired from Meadow River Coal Company in 2000, and I was working. The children were happy with his arrangement. [Petitioner] would discipline them, when necessary, as any good parent should and this included long lectures about how to get along in the world, because life will be much better for them if they followed his advice.

Letter from Debra L. Martin to Trial Judge.

10. At the aforementioned January 4, 2008 hearing, the Court, upon consideration of the letters written on behalf on Petitioner in support of his bond motion, the matters contained in the file, observations by the Court, and arguments of Counsel, found that "it would be imprudent and unsafe judgment to set bail due to the amount of alleged violence or other circumstances attendant to the situation after the incident," and denied Petitioner's Motion for Bail. An Order denying Petitioner's aforementioned Motion for Change of Venue and Motion for Bail was entered on March 4, 2008.

11. The Court entered a Transport Order on March 3, 2008, which, in relevant part, stated:

> Petitioner by counsel advised the Court that they desire a psychiatric evaluation to be performed on Petitioner and have contacted the office of Bobby Miller, M.D. of 916 6th Avenue, Huntington, WV 25701 about conducting the same. The Court ordered that the defendant's counsel shall notify the administration of the South-central Regional Jail Authority at least 48 hours prior to the scheduled appointment and that, with such notification, the Regional Jail Authority shall cause the defendant to be transported to and from his appointment with the above psychiatrist.

Transport Order, March 3rd, 2008, Indictment No. 07-F-159.

12. On March 31, 2008, the Court mailed all counsel letters requiring them to submit *voir dire* questions to the Court by 12:00 noon Tuesday, April 1, 2008, and also informing them that the Court will ask all questions deemed to be appropriate, prefacing the Court's asking by telling the jury panel which side proposed the questions.

13. On April 1, 2008, the State filed a document captioned "Voir Dire Questions to be Submitted to Jury on behalf of State," which contained 20 proposed questions. Petitioner also filed a document captioned "Jury Questionnaire," which contained 30 proposed questions.

7

14. A letter from the Court to all counsel, dated April, 18, 2008, states: "[e]nclosed are three New Court's Instruction Nos. 1, 2, and 3. These three instructions replace Court's Instructions Nos. 1, 2, and 3 previously sent to you."

15. Petitioner's jury trial commenced on April 18, 2008. At the beginning of the jury selection process, the Court, in the anteroom with Petitioner, counsel for both sides, and prospective juror Bracken, explained to Petitioner that the Court would separately inquire each of the prospective juror's knowledge regarding the facts of the case as follows[1]:

> The Court: before we inquire of Mr. Bracken, Mr. Martin, I need to tell you, sir, that you have a right to have every part of this case conducted out in the open courtroom, but because of the large number of people that we have, it's easier to move a few of us back into this room than to move all those people out and just simply have them stand in the hall, because I don't have a lounge for them. But if you want to have this jury selection process and individual questioning of these jurors done out there, we'll move everybody out and do it one at a time out there or – after you consult with your lawyers, you can consent to having these types of hearings which the rest of the jurors do not need to hear back here.
> The Defendant: That's quite all right. I trust you, Judge Hatcher, to do the right thing, whatever's expedient for justice.
> The Court: All right. If you change your mind at any time during the court of this trial and you want to have these types of hearings in the open courtroom, speak up.
> The Defendant: Okay.
> The Court: Otherwise, I'll consider your answer to be a waiver of your ongoing – of your open court rights and consider it to be an ongoing waiver unless and until you tell me otherwise.
> The Defendant: Okay.
> (Indictment No. 07-F-159 Trial Transcript (hereinafter "Trial Transcript"). Vol. I, pp 27-28).

16. During the aforementioned *voir dire* process, the Court asked every prospective juror the following questions: (1) "what have you read or heard in the news media about today's case?" (2) "And based on what you saw on TV and what you read in the newspaper, have your formed an opinion as to whether this defendant is guilty or this defendant is not guilty of the charges?" The Court excused, even without any Motion by Petitioner, all prospective jurors who answered affirmatively to said questions, or who indicated that they might be influenced by the news media, and directed the excused prospective jurors to leave the Courthouse without having any further contact with any other prospective jurors. For example, in the anteroom the Court asked questions to Prospective juror Craigo:

---

[1] Before the Court heard any Motion to strike a prospective juror, the juror, after questioning, left the anteroom.

8

The Court: Ms. Craigo, what have you read or heard in the news media about today's case?

Prospective Juror Craigo: I saw it on TV when it was announced. and I've watched the TV. I've read it in the newspaper also.

The Court: which newspapers?

Prospective Juror Craigo: The Beckley Herald – Post Herald.

The Court: and do you recall about how long ago it was that you last saw something in the newspaper that you read or heard something on TV?

Prospective Juror Craigo: It's been a while. I haven't heard anything lately.

The Court: all right. And based on what you saw on TV and what you read in the Beckley newspaper, have your formed an opinion as to whether this defendant is guilty or this defendant is not guilty of the charges.

Prospective Juror Craigo: I have formed an opinion.

The Court: you have formed an opinion?

Prospective Juror Craigo: (Nodded affirmatively).

The Court: all right. Ms. Craigo, we'll excuse you from further participation in this case....

Mr. ReBrook: Judge, excuse me, if you would, would you also tell Mrs. Craigo not to discuss what we discussed back here with any other juror?

Prospective Juror Craigo: I'm not –

The Court: She's not. She's not going to – She's going to leave, she's not going to go sit down with anyone. She wants to go home.

Prospective Juror Carigo: Than you.

(*Id.,* pp 31-33).

17. In the aforementioned *voir dire*, the Court also excused prospective jurors who said that they might be influenced about the case by the local communities' discussions regarding the case, or who said that they might have personal knowledge or connection with any individual who might have any potential involvement with the case.

   a. For example, in the anteroom the Court asked questions to Prospective juror Wilson in the anteroom:

> The Court: Okay. So based on all that you've told me up to now, have your formed an opinion as to whether this defendant is guilty of not guilty?
>
> Prospective Juror Wilson: 1 can't say, but like I said, I knew one of the boys. He had a crush on my daughter.
>
> The Court: Would the fact that you knew one of the boys, would that cause you to have any difficulties with this case?
>
> Prospective Juror Wilson: It may.
>
> The Court: All right. Ms. Wilson, I'm going to excuse you
>
> (*Id.,* p 70).

   b. Also, in the anteroom the Court asked questions of Prospective juror Alexander:

9

The Court: Based on what you heard from other people discussing the case, based on what you've read in the newspaper or learned from any other source, have you formed an opinion in your mind as to whether this defendant is guilty or whether this defendant is not guilty? Do you have an opinion one way or the other?

Prospective Juror Alexander: Not really, no.

The Court: Is that a yes or is that a no?

Prospective Juror Alexander: I don't really have an opinion. I'd say that would be a no.

The Court: All right. Now, if you're on this jury with eleven other people, would you be able to put out of your mind anything you've seen or heard in the news media or from anyone else and base your verdicts -- three of them -- with eleven other people based solely on the evidence that's presented during the trial in the courtroom? Could you do that?

Prospective Juror Alexander: Yes, I'll do my best.

The Court: All right, sir. Any questions, Mr. Harris?

Mr. Harris: So you think it's possible that it could have some influence on you, as to what you've heard in the community, or from the community?

Prospective Juror Alexander: I guess, yes, sir, I guess it would.

The Court: All right. Mr. Alexander, we're going to excuse you from further participation in today's case.

(*Id.*, pp78-79).

c. Further, for example, the Court questioned Prospective juror Weatherford in the anteroom:

The Court: by the nature of your work, you know a number of police officers, you know the prosecutor.

Prospective Juror Weatherford: Yes.

The Court: Would the fact that you know those people and see them in passing or at work from time to time, would that cause you to tend to give greater or lesser weight to any of their testimony or their side of the case?

Prospective Juror Weatherford: Yes, it probably would.

The Court: You would tend to believe them more than other people?

Prospective Juror Weatherford: Yes.

The Court: Well, we're going to excuse you from this case.

(*Id.*, pp 99-100).

18. Petitioner, by counsel, in the anteroom, moved to strike any prospective jurors who indicated they might have any bias, and the Court granted Petitioner's motion if cause was shown. For example:

The Court: as the assistant [state park] superintendent, he wears a uniform, he wears a badge, he carries a side arm, and he drives a vehicle with a blue light on the dash, and he is authorized to stop cars, make arrests, detain people and charge them -- bring them before magistrates and have them charged with crimes, so I'll put that out for you before your deal with anything else. ......

10

Mr. Rebrook: I guess my only question would be, Mr. Bracken, because of what you do – and incidentally, I love your park – would you be more inclined to believe the testimony of police officers other than that of other witnesses?

Prospective Juror Bracken: Yes, sir, I would.

Mr. Rebrook: I move to strike the witness – the juror, your Honor.

The Court: All right. [Motion granted].

(*Id.*, pp. 28-30).

...

The Court: And based upon the radio traffic that you heard and what you scanned in the Charleston Gazette, have you, in your mind, formed an opinion as to whether this defendant is guilty or this defendant is not guilty of the three charges?

Prospective Juror Bostic: No, sir.

...

The Court: All right. Any questions, Mr. Clifford?

Mr. Clifford: Yes, your Honor, with the Court's permission. You indicated that your work for a fire department?

Prospective Juror Bostic: Volunteer. Volunteer for Boomer.

Mr. Clifford: Boomer?

Prospective Juror Bostic: Yes.

Mr. Clifford: I notice, with the Court's permission, that you work with Bureau of Child Support and Enforcement?

Prospective Juror Bostic: Yes, currently, yes.

Mr. Clifford: What do you do for them?

Prospective Juror Bostic: I am an enforcement worker, I work in nonpaying cases.

Mr. Clifford: and from time to time in that capacity and also probably the capacity of your volunteer fire department, you have to work with either the prosecutor's office or the various police agencies?

Prospective Juror Bostic: Police departments, on a rare occasion. No as for prosecuting attorney's office, no.

Mr. Clifford: No?

Prospective Juror Bostic: No, because our call volume is not very large in our area, so –

Mr. Clifford: Okay. You wouldn't be inclined to give the State's witnesses any more credence than any other witness just because of your job?

Prospective Juror Bostic: No, sir.

Mr. Clifford: I've got some concern, your Honor, because he may have heard some of the evidence that might be coming in here, but beyond that, he indicated that –

The Court: Well, do you or do you not have a motion?

Mr. Clifford: Well, I'll make the motion.

The Court: Based on this juror's answers to all questions and the opportunity to be questioned, I deny the motion.

(*Id.*, pp 112-14).

19. In the aforementioned preliminary examination of the prospective jurors, the Court, in the anteroom, extensively and separately questioned each of the prospective jurors as to whether they were prejudiced by media coverage, and those prospective jurors who replied negatively were directed by the Court to return to their seat in the courtroom and not to discuss with fellow jurors anything the Court talked about in the anteroom. For example:

> The Court: All right, Mr. Bowyer, what have you – was it something you saw in the – on TV, heard on the radio or read in the newspaper –
> Prospective Juror Bowyer: Yes, sir.
> The Court: Which one?
> Prospective Juror Bowyer: Newspaper, and then television both.
>
> ...
>
> The Court: And based on what you read and what you saw on television, have you formed an opinion as to whether this defendant is guilty or this defendant is not guilty?
> Prospective Juror Bowyer: No, sir, because I actually don't really know what, you know, actually went on.
>
> ...
>
> The Court: Okay. And are you – do you believe that if you're one of the jurors in this case, that you can put out of your mind whatever it was you saw on TV or read in the newspaper and base your decision in this case solely and only upon what's presented in the courtroom during the trial?
> Prospective Juror Bowyer: Yes, sir.
>
> ...
>
> The Court: All right. Mr. Bowyer, I'm going to send you back out to your seat and direct you, please, not to discuss with your fellow jurors anything we've talked about back here.

(*Id.*, pp 33-36).

20. During the aforementioned *voir dire*, after the aforementioned preliminary examination, the Court asked the duly chosen prospective jurors (the trial panel of 24) the following questions and received the following responses:

1) Is there any member of this panel who is not over the age of 18 years? (No response[2].)

2) Is there any member of this panel who is not presently a citizen of Fayette County, of West Virginia and of these United States? (No response.)

3) Is there any member of this panel who has been convicted of perjury, subornation of perjury, false swearing or any other infamous offense, that is, a felony crime, or has lost the right to vote because of any criminal conviction? (No response.)

---

[2] "(No response)" means that no juror had an answer.

12

4) Is there any member of this panel who has served on a magistrate jury, a petit jury or a grand jury within the last two years other than at this present term of court? (No response.)

5) Is there any member of this panel who requested of any court official or requested of anyone else that his or her name be place on this jury list? (No response.)

6) Do any of you on this panel have any case to be tried in Fayette County Circuit Court by a petit jury during this what we call the January term of Court? Even though we're into April? (No response.)

7) Are any of you related by blood or by marriage to the defendant? (No response.)

8) Do any of you know the defendant from any business or any social relationship? Do you know this defendant at all? (No response.)

9) Are you related by blood or by marriage to any of three alleged crime victims?

    i. prospective juror Fox said that his brother-in-law was kin to the Cox family, but he was not real close friends with the crime victim Cox's family. The Court excused prospective juror Fox from further participation in this case based on the his aforementioned answer. (*Id.*, pp 145-47).

    ii. prospective juror Hudnall was questioned by the Court in the anteroom as follows:

> The Court: go head and tell me, what did you hear on the news?
> Prospective Juror Hudnall: basically, you know, just general, three people were shot and something about four wheelers and motor bikes.
> The Court: Okay. Based on – that's your only source of information about this case?
> Prospective Juror Hudnall: Yeah. But I do know the mother of one of the people that was a victim.
> The Court: And which -- who is that?
> Prospective Juror Hudnall: the one with the last name Hughes.
> The Court: Okay.
> Prospective Juror Hudnall: I don't know that person individually, but I do know the mother in 2002 homebound my student—my daughter.
> The Court: Justin Hughes' mother homebound your –
> Prospective Juror Hudnall: Yes, she's a school teacher.
> The Court: All right. Based upon all you know and that connection with the Hughes lady, have you formed an opinion in your mind as to whether this defendant is guilty or not guilty?

13

Prospective Juror Hudnall: No, I have no opinion, no.

The Court: when was the last time you saw or talked to Ms. Hughes?

Prospective Juror Hudnall: at that time.

The Court: At?

Prospective Juror Hudnall: I think it was 2002, the fall of 2002.

...

The Court: if she is a witness in this case or if her only connection to the case is her son, Justin Hughes, would that cause you to tend to have views that would be more favorable to the State or more favorable to the defendant?

Prospective Juror Hudnall: No.

...

Mr. Clifford: how long did Ms. Hughes supervise the Homebound?

Prospective Juror Hudnall: it was a few months. She would periodically visit the house, and you know, I didn't stay in the room with them, but she – like I say, she taught my daughter, so –

Mr. Clifford: I'm sorry, I didn't –

The Court: Taught her daughter.

Prospective Juror Hudnall: She taught my daughter.

Mr. Clifford: Okay, all right. Did you all develop a friendship?

Prospective Juror Hudnall: No, we didn't. I know my daughter is still acquainted with her from time to time, but you know, I – I don't even know where sh's at this time, so –

Mr. Clifford: would that cause you any discomfort or extra –

Prospective Juror Hudnall: No, not really. No.

...

The Court: anything as to Ms. Hudnall?

Mr. Harris: No motion from the State.

Mr. Clifford: none on behalf of the defendant, your Honor.

(*Id.*, pp 154-57).

10) Are any of you on the panel or any member of your immediate family now serving as a member of or as an employee of any prosecuting attorney's office or any United States Attorney's Office? (No response.)

11) Are any of you on the panel or any member of your immediate family employed in law enforcement of any kind? State, federal, city, county.

    i.   prospective juror O'Neal responded:

Prospective Juror O'Neal: Steve Yarber, Deputy.

The Court: Steve Yarber is a Fayette County Sheriff. .. what relative is he?

Prospective Juror O'Neal: He's a great nephew.

14

> The Court: Great nephew. If you're on the jury and police officers testify in this case, would you tend to give greater or lesser weight to their testimony because of your great nephew?
>
> Prospective Juror O'Neal: No.

(*Id.*, pp 161-62).

ii. prospective juror Hill responded:

> The Court: What relative?
>
> Prospective Juror Hill: It's me. I'm a correctional officer at Mount Olive Correctional Complex.
>
> The Court: All right. And if you're on this jury with eleven other people, would you tend to give greater or lesser weight to a police officer's testimony because you work as a corrections officer?
>
> Prospective Juror Hill: No, sir.

(*Id.*, p 162).

12) Have any of you made up your minds or formed or expressed any opinion as to the guilt or as to the innocence of this defendant in this case? (No response.)

13) Were any of you on this panel a member of the September 2007 Fayette County Grand Jury which returned the indictment in this case? (No response.)

14) Are any of you on this panel sensible of or conscious of any prejudice or any bias for or against this defendant, Gary D. Martin, or for or against the State of West Virginia or otherwise which would in any way prevent or interfere with your returning a fair and an impartial verdict or verdicts in this case in accordance with the law and the evidence presented in this room during this trial? (No response.)

15) Do any of you on this panel have any interest at all on how this case should turn out? (No response.)

16) Do any of you on this panel know of any reason at all — no matter what the reason may be — why you cannot sit as a member of a jury in this case and return a verdict that's fair and impartial to both sides and based solely on the law and the evidence? (No response.)

17) Are you related by blood or by marriage to any of those people named [the prosecuting attorney and assistant Carl Harris, Jennifer Hewitt, and other assistants Brian Parsons, Tom Steele, Vickie Hilton, Matthew England]? (No response.)

18) Do you know any of those people named, under any circumstance?

i. prospective juror Greene responded:

> Prospective Juror Greene: Tom Steele from church.

15

> ...
> The Court: All right. Would the fact that you know Mr. Steele from church, would that cause you to tend to give greater or lesser weight to the State's side of this case?
> Prospective Juror Greene: No.

(*Id.*, p 165).

ii. prospective juror Tyler responded:

> Prospective Juror Tyler: Brian Parsons.
> The Court: Brian Parsons. And how do you know him?
> Prospective Juror Tyler: From a family member's magistrate court case.
> The Court: All right. And he represented the State in that matter?
> Prospective Juror Tyler: yes.
> The Court: would that situation cause you to look unfavorably upon the State's side of this case because of that situations?
> Prospective Juror Tyler: no, sir.

(*Id.*, pp 165-66).

iii. prospective juror March responded:

> Prospective juror March: I know prosecuting Attorney Harris. ... He did some legal work.
> The Court: It's been some year ago?
> Prospective juror March: Yes.
> The Court: All right. Would the fact that he some years ago did some professional work for you and you know who he is, would that cause you to tend to give greater or lesser weight to the State's side of this case?
> Prospective Juror March: No.

(*Id.*, pp 166-67).

iv. prospective juror O'Neal responded:

> Prospective juror O'Neal: the prosecutor, Harris, Parsons, Steele, most of the --
> The Court: All right. You know them simply because of who they are and what they do.
> Prospective juror O'Neal: I know them for what they do --
> The Court: All right. Would the fact that you know all of these people in that office, would that cause you to give greater or lesser weight to the State's side of this case?
> Prospective juror O'Neal: No.

(*Id.*, p 167).

19) The two lawyers representing the defendant in this case are the gentlemen seated to my left. The first one is Mike Clifford. The next lawyer is Ed Rebrook. Both of these lawyers are form Charleston. Are any of you related by blood or by marriage to either

16

of these two men? Do any of you on this panel know either Mr. Clifford or Mr. Rebrook from any situation or circumstances? (No response.)

20) I'm going to go over the list of all possible witnesses who may be called in this case, and the questions that I have for you are to all of these people I will name: are you related by blood or by marriage to any of them, do you know any of them at all in any form or fashion? If you have an answer, please raise your hand.

    i.    Doctor James A. Kaplan, Chief Medical Examiner for the State of West Virginia. (No response.)

    ii.    Annette Ashley, A-S-H-L-E-Y, County Medical examiner. (No response.)

    iii.    Randall Lee Groves, G-R-O-V-E-S, ... Hico, West Virginia. (No response.)

    iv.    Debra, D-E-B-R-A, Ann Ramsey, Gauley Bridge. (No response.)

    v.    Thomas E. Groves, Hico. (No response.)

    vi.    Aaron A. Feltner, Jan-Care Ambulance. Prospective juror Compton responded:

> The Court: Ms. Compton, how do you know –
> Prospective Juror Compton: Just from kids in school. Not since he's grown up. I wouldn't even know what he looked like.
> The Court: all right. And based on the fact that you knew young-then young Mr. Feltner as a school child, would that cause you to give greater or lesser weight to any testimony he might offer?
> Prospective Juror Compton: No.

(*Id.*, pp 171-72).

    vii.    Sergeant Bill Scott, W. J. Bill Scott, West Virginia State Police. (No response.)

    viii.    Corporal Jack Brown, Fayette County Sheriff's Department. (No response.)

    ix.    Mark Webb. He used to be a Fayette County Deputy Sheriff, ... and now is a security officer at the veteran's hospital in Beckley, West Virginia. (No response.)

    x.    Katrenia, K-A-T-R-E-N-I-A, Hawkins, Hico. (No response.)

    xi.    Amy Nibert, N-I-B-E-R-T. She is a civilian forensic person, evidence person, in the sheriff's department. Prospective juror Greene responded:

> The Court: Ms. Greene, how do you know Ms. Nibert?
> Prospective Juror Greene: through her parents.
> The Court: and if Ms. Nibert is a witness in this case, would that knowledge of her and her parents cause you to tend to give greater or lesser weight to her testimony.
> Prospective Juror Greene: No, sir.

(*Id.*, p 173).

    xii.    Fayette County Sheriff's Detective Glenn Chapman. (No response.)

    xiii.    Fayette County Sheriff's Department Sergeant Jim Sizemore, the gentlemen right there. Prospective juror O'Neal responded:

17

The Court: Mr. O'Neal, you know Sergeant Sizemore?
Prospective Juror O'Neal: I know him from the deputy –
the office, and I've talked with him about the case we had.
The Court: about a case you had where someone had taken
something from your place of business.
Prospective Juror O'Neal: right.
The Court: all right. Nothing about this case.
Prospective Juror O'Neal: Nothing.
The Court: all right. If Sergeant Sizemore testifies in this
case, would you tend to give greater or lesser weight to his
testimony because you've talked to him?
Prospective Juror O'Neal: No.
(*Id.*, pp 173-74).

xiv.  Patsy Hypes, H-Y-P-E-S, Hico. (No response.)
xv.   Robert Randolph, Fox, Jr., Hico. Prospective juror Rhodes responded:
The Court: Mr. Rhodes, you know Mr. Fox?
Prospective Juror Rhodes: yes, sir. ... he was a customer in
my store that I worked. He would come into purchase.
The Court: and it's auto parts?
Prospective Juror Rhodes: no, it's Fayco Lumber.
The Court: ... if he is called to the witness stand and you're
on the jury and you recognize him to be, by face, a former
customer, would that cause you to tend to give greater or
lesser weight to any testimony he might offer?
Prospective Juror Rhodes: no, sir.
(*Id.*, pp 174-75).

xvi.   Carl Balaine, B-L-A-I-N-E, Cox, Sr. (No response.)
xvii.  Nathan A. Coleman, Jan-Care Ambulance. (No response.)
xviii. Michelle A. Cook. She works for the State Police Laboratory. (No response.)
xix.   Philip K. Cochran, C-O-C-H-R-A-N, works for the State Police Laboratory. (No response.)
xx.    Initials M as in Mike, N as in Nancy, Runyan, R-U-N-Y-A-N, works at the West Virginia State Police Laboratory. (No response.)
xxi.   Robyn, R-O-B-Y-N, Rogers, R-O-G-E-R-S, works for the State Police Laboratory. (No response.)
xxii.  Gary T. martin, II. (No response.)
xxiii. Nathan Hess from – gain, these are the best I can give you – Brunswick, Ohio. (No response.)
xxiv.  Reverend Allen, A-L-L-E-N, R., Whitt, W-H-I-T-T, from Danese. (No response.)
xxv.   Debra L. Martin, D-E-B-R-A, L. Martin. (No response.)
xxvi.  Dawn R. Bragg, Danese. (No response.)
xxvii. Gary Christian, Danese, (No response.)
xxviii. Karen W. Bryant, Danese. (No response.)
xxix.  Michael Martin, Danese. (No response.)
xxx.   Ricky Vandall, Meadow Bridge. (No response.)

18

xxxi.    H. D., initials H as in Harry, D as in Dan, H.D. Smith, Danese. (No response.)
xxxii.    George A. Campbell, Danese. (No response.)
xxxiii.    Frances, F-R-A-N-C-E-S, Bennett, Danese. (No response.)
xxxiv.    Roger Bennett, Danese. (No response.)
xxxv.    Gene Kincaid, Jr., Gauley Bridge. (No response.)
xxxvi.    Lowell Daniel Martin, Danese. (No response.)

21) Would any of you on this panel have any conscientious objection to returning a verdict or verdicts of guilty of first degree murder if you knew that in so doing, if no mercy is recommended by the jury, the defendant in this case would, by law, be confined in the State penitentiary for the remainder of his natural lifetime?

    i.    The Court excused only one prospective juror Ms. Gates based on her comment that "I don't feel comfortable having that kind of power over someone I don't even know." (*Id.*, p 179-80).

22) Would any of you on this panel have any conscientious objection to returning verdicts of not guilty or verdicts of guilty if the evidence in the case warranted such verdicts? (No response.)

23) Does anyone on this panel or anyone in their household own a pistol commonly called handgun or handguns? Do any of you on the panel or any member of your immediate family carry a handgun openly or under a concealed weapons permit? Three prospective jurors responded:

> The Court: All right, Mr. Roop holds his hand up. Thank you, sir.
> Prospective Juror O'Neal: I don't carry mine, but I do have a permit.
> The Court: You have a permit, but you don't use it.
> Prospective Juror O'Neal: No.
> The Court: All right, sir.
> Prospective Juror Herron: Is that for me or for my wife or anybody in the household?
> The Court: Anybody in your immediate family or you.
> Prospective Juror Herron: Yeah, my wife's got a permit.
> The Court: Okay. And that is Mr. Herron. All right.

(*Id.*, pp 195-96).

24) Is there any member of the panel who believes that even though it is legal in West Virginia to carry, without a permit, a handgun so long as it is not hidden or concealed, that it is never the less wrong to do so? (No response.)

25) Do any of you on the panel or any member of your immediate family own what is commonly referred as an assault rifle? (No response.)

19

26) Do any of you on the panel or any member of your immediate family own or ride an ATV commonly referred to as a four wheeler or dirt bikes? (No response.)

27) Have any of you on the panel or any of your immediate family or close friends ever been threatened by someone while you were riding on a four wheeler or a dirt bike? (No response.)

28) Is there anyone on the panel who believes that the State's burden of proof in a murder case, like the case to be tired, that it should be beyond all possible doubt rather than beyond a reasonable doubt, which is the law and the legal standard in the State of West Virginia? (No response.)

29) Is there anyone on this panel who has not watched television shows like CSI Miami, CSI New York, Law and Order, any of those shows? Anyone on the panel who has not watched some of those shows on television? (No response.)

30) Is there anyone on the panel who believes that real life crime investigations are conducted and handled like those crime investigations on any of those television shows? (No response.)

31) Is there anyone on this panel who has taken a class or classes in law of any kind? One prospective juror responded:

> Prospective juror Whitworth: I have an associate's degree in paralegal...
> probably two years ago, from Mountain State University.
> The Court: Do you work in that profession?
> Prospective juror Whitworth: No.

(*Id.*, p 198).

32) Is there any member of the panel or any member of your immediate family who has ever been charged with any type of violations of the law, any crime?

    i. Prospective juror Phillips responded:

> Prospective Juror Phillips: my son was charged with possession [of some controlled substances].
> The Court: Was that in West Virginia?
> Prospective Juror Philips: No, it was in Maryland.
> The Court: All right. And based on the fact that he was so charged and dealt with, would that cause you to have hard feeling toward State of West Virginia?
> Prospective Juror Phillips: No.

(*Id.*, pp 199-200).

ii.     Prospective jurors Tyler, Roop, Hill, and Rohdes responded and requested to

        speak in the anteroom. The Court, Petitioner, parties' counsel, and prospective

        juror Tyler moved to the anteroom:

> The Court: all right. Ms. Tyler, what situation have your
> family members had?
> Prospective Juror Tyler: It was a son who was in magistrate
> court on a battery case, and he did have to pay a fine for
> that. No jail time, but he did have to pay a fine for a battery
> case.
> The Court: all right. Is that in Fayette County?
> Prospective Juror Tyler: it's in Fayette County.
> The Court: Was it recent?
> Prospective Juror Tyler: A few months ago, and that's the
> one that Brian Parsons prosecuted –
>
> ...
>
> The Court: All right. So would the fact that your son had
> that situation, that encounter with the law and these people,
> and had to pay a fine, would that cause you to, in this case,
> to have hard feelings and hold anything against the State of
> West Virginia in the prosecution of this case?
> Prospective Juror Tyler: No.
> The Court: all right. Ms. Tyler, thank you. Go back and
> take your seat, we'll be right out.
> (prospective juror Tyler exited the anteroom.)
> The Court: Anything as to this lady?
> Mr. Harris: No, your Honor.
> Mr. Rebrook: No.

        (*Id.*, pp 200-2).

iii.    Prospective juror Roop entered the anteroom and responded:

> Prospective Juror Roop: [my brother] has been in here
> more than he's been out anywhere else, with you. I think
> you tired him a couple three times, Raymond.
> The Court: Raymond Roop, that's a well-known name in
> local jurisprudence. Would the fact that your brother
> Raymond has had, oh, a number of encounters with the law
> and the criminal justice system, has been locked up, would
> that cause you to have hard feelings against Mr. Harris in
> the prosecution by the State of this case?
>
> ...
>
> Prospective Juror Roop: I don't think it would bother me
> any, you know.
>
> ...
>
> (Prospective Juror Roop exited the anteroom.)
> The Court: Anything on Mr. Roop?

21

Mr. Clifford: No, your Honor.

Mr. Harris: No.

(*Id.*, pp. 203-4).

iv. Prospective juror Hill entered the anteroom and responded:

Prospective Juror Hill: I'm not close with him, but my younger brother was charged, I believe, with attempted murder earlier this year—

The Court: In –

Prospective Juror Hill: I think it was dismissed.

The Court: Where was it?

Prospective Juror Hill: in Fayette County.

The Court: What's his name?

Prospective Juror Hill: Michael Hill.

The Court: Would the fact that this brother with whom you're not close had that encounter of which you're not certain of all the details with the law in Fayette County, would that cause you to tend to have hard feelings against the state and hold it against them in this case?

Prospective Juror Hill: No, sir.

The Court: Okay. Would it cause you to favor the defendant's side of this case?

Prospective Juror Hill: No, sir.

The Court: Any questions of Mr. Hill?

Mr. Harris: No, your Honor.

Mr. Clifford: Did that happen this year?

Prospective Juror Hill: I believe it happened last year.

Mr. Clifford: Oh, Okay.

Prospective Juror Hill: It was just a – I guess it was kind of an accident – well, not an accident. She was beating him through the window and he backed out.

Mr. Clifford: Okay, all right.

The Court: All right, Mr. Hill, I'll ask you to go back and take your seat and don't talk about this out there. We'll be right out.

Prospective Juror Hill: Yes, sir.

(Prospective Juror Hill existed the anteroom.)

The Court: Anything as to Mr. Hill?

Mr. Harris: You know, that case has not been dismissed. still pending.

The Court: No, he didn't know about it.

(Neither State's counsel nor Petitioner's trial counsel made any motion to strike Prospective Juror Hill.)

(*Id.*, pp 205-7).

v. Prospective juror Rohdes entered the anteroom and responded:

22

Prospective Juror Rohdes: All right, it was about the Robert Fox. I just remember that he has a guy that used to come in with him, his name was Weasel, we always called him Weasel. And it just dawned on me, his name's Billy Legg. Now, whether he's any kin to this, I don't know.

The Court: Okay.

Prospective Juror Rohdes: I mean, I have no knowledge of this case, I don't know the gentleman, I don't know the victims.

The Court: That's just the name that popped in your head—

Prospective Juror Rohdes: Well, yeah, his name was Billy Legg, but they always called him Weasel. They worked together for General Ambulance and I just didn't want you to –

The Court: Okay, just a minute. Anybody by the name of Weasel in this case?

Mr. Harris: Your Honor, it could be one of Mr. Legg's relatives, but they're not witnesses.

The Court: Okay, you –

Prospective Juror Rhodes: I didn't want it to come out later.

...

The Court: And if those people show up on the witness stand and you happen to recognize them, would it cause you to –

Prospective Juror Rhodes: Oh, no, sir. ... But I just didn't want it to come out later and then it be a problem.

The Court: You did exactly right. Thank you very much, and take your seat, and we'll be right out.

(Prospective Juror Rhodes exited the anteroom.)

Mr. Rebrook: Judge, my client would waive the right to be in the courtroom if you just want to go out and ask if there's anybody else that wants to talk—

The Court: No, sorry.

(The Court, counsel and the defendant retired to the open courtroom.)

(*Id.*, pp 207-9).

33) Is there any member of the panel or any member of your immediate family who has been the victim of a crime of any kind? Three prospective jurors responded:

The Court: Mr. O'Neal, you've had personal property stolen from your businesses, right?

Prospective Juror O'Neal: Right, right.

The Court: All right. And some of those have gone unsolved and property unrecovered.

Prospective Juror O'Neal: Right.

The Court: Would that fact cause you to hold it against the State of West Virginia in this case?

Prospective Juror O'Neal: No.

The Court: All right. And Ms. March?

Prospective Juror March: Yes, I had two automobiles stolen. ... but that was in the State of Virginia.

The Court: State of Virginia. Even though it was in the State of Virginia, or as they like to call it, the Commonwealth of Virginia, would you hold that situation or those situations against the State of West Virginia here in this case?

Prospective Juror March: No.

The Court: Mr. Gravley?

Prospective Juror Gravley: Yes, sir.

The Court: What situation?

Prospective Juror Gravley: just minor situation, I also had some money stole a couple of times and then also had a couple items stole out of my vehicles at home.

...

The Court: All right. Would that cause you to have hard feelings against the State affect your judgement in this case?

Prospective Juror Gravley: No, it would not.

(*Id.*, pp 210-13).

34) Has any member of – have any of you on this panel taken any classes in gun repair or any other classes dealing with firearms, repair, manufacture or shooting training? Are any of you on this panel members of or have you ever been members of any gun, clubs, sporting clubs or hunting clubs? Four prospective jurors responded:

Prospective Juror Gravley: Yes, sir, I'm a member of a hunting club right now.

The Court: All right. Which one and where?

Prospective Juror Gravley: It's up in Greenbrier County.

The Court: ... you hunt deer, turkey, everything?

Prospective Juror Gravley: Hunt deer, turkey, even get to fish some on it.

The Court: All right. And Mr. Nichols?

Prospective Juror Nichols: I was in a hunting club at – three years ago, four years ago, but I'm not now. And I've had concealed weapons training, but I didn't get the license.

The Court: All right. And Mr. Redden?

Prospective Juror Redden: Member of the Run & Gun Hunt Club... It's in Fayette County.

...

Prospective Juror O'Neal: I had the concealed weapon class and I got the permit.

(*Id.*, pp 213-15).

24

35) Are there any members of this panel who, on a regular basis, target shoot with pistols, rifles, or shotguns or all three? Three Prospective jurors responded:

> Prospective Juror Nichols: I do.
> The Court: Mr. Nichols does, Mr. Gravley does, and Mr. Bowyer does.
> (*Id.*, p 215).

36) Do you believe that a person is, under the law, entitled to use reasonable force, including deadly force, to protect himself, his family or even a total stranger if he reasonably believes that he, his family or even a total stranger is in imminent danger of receiving a serious injury or deadly injury? (No response.)

37) Do any of you on the panel believe that a person who's charged with a crime or crimes should be required to prove themselves to be innocent? (No response.)

38) Do any of you on the panel believe that a criminal defendant who does not testify in their own defense is probably guilty of the crimes charged? (No response.)

39) Do any of you on this panel have friends who are police officers of any type or kind in Fayette County, West Virginia? And I think we've covered it with some of you. But those with whom we haven't asked that question, do you have an answer? (No response.)

(*Id.*, pp 142-216).

21. In the aforementioned *voir dire*, after the Court asked the aforementioned thirty-nine (39) questions to the prospective jurors and received the prospective jurors' responses/answers, the Court declared the trial panel free of exception after the following inquiries:

> The Court: All right. All there any objections or any exceptions to this panel for anything which we now know?
> Mr. Harris: No, your Honor, this panel is acceptable to the State of West Virginia.
> The Court: Mr. Clifford?
> Mr. Clifford: That's fine, your Honor, yes.
> The Court: Do what?
> Mr. Clifford: That's acceptable.
> The Court: Okay. I declare this panel free of exception.

(*Id.*, pp 216-17).

22. After the aforementioned *voir dire*, on April 18, 2008, a lawful jury of twelve (12) was duly chosen, impaneled and sworn, and two (2) alternate jurors were chosen and sworn.

23. On April 18, 2008, the date the jury trial commenced, Petitioner, by counsel, filed "Motion for Jury View," of the crime scene on Stringtown Road. The Court granted said motion and the jurors (including the two (2) alternates) were transported to the scene of the alleged

25

crimes. Upon returning from the viewing, the Court, in the open court, gave the jurors "over-the-weekend instructions" the record stating, in relevant part, that:

> Now, as you know, what I'm about to tell you are your over-the-weekend instructions which, under the oath that you've just taken today to try this case, you're obliged to obey. Do not talk about this case among yourselves.... Do not talk about this case with anyone at all. Do not allow anyone to talk about this case to you or within your presence. If that happens, immediately tell them to stop, get away, let me know who and what happened. Do not talk to anyone who is not a member of your jury during your breaks. I would suggest to you that you limit your contact with people between now and Monday.... Keep your minds open about this case and do not form any opinions about this case until I send you to your jury room at the end of this trial to consider of your verdicts. Do not — do not return to the area from which we have just come.... Do not read any books or dictionaries or any – access any Internet sites or do anything at all in any attempt to try to educate yourself about this case, ... do not read, watch or listen to any news media accounts of this proceeding, and don't allow anybody to tell you about any such news media accounts.

(Trial Transcript, Vol. I, pp 242-43).

24. On April 18, 2008, after the jurors were instructed by the Court as aforementioned, the jurors exited the courtroom and departed. Then the Court conducted "Stipulation of Evidence" with Petitioner, his counsel, and the State, as shown, in relevant part, by the following excerpts of trial transcripts:

> The Court: I'm going to read this aloud, Mr. Martin, so I want you to hear what I'm reading. It says, "The State of West Virginia and the defendant, Gary D. Martin, hereby agree that the following items of physical evidence and lab reports relating to that physical evidence may be admitted into evidence without the necessity of producing the witnesses from the West Virginia State Police Lab to prove the results of the examinations and the chain of custody of the evidence: 1, AK-47 Variant and ammunition clip, ... No. 2, "Additional ammunition clip for the AK-47." ... No. 3, "the nine shell casings from the AK-47," ... 4, "Recovered bullet or bullet fragment." 5, "Shoe which had blood from victim." ... 6, "Marijuana."... **Have you heard what I just read, Mr. Martin?**
> **The Defendant: Yes, sir.**
> The Court: And did you sign your name to this document?
> The Defendant: Yes, sir.
> The Court: And you signed your name to this document in the presence of Mr. Rebrook, your counsel lawyer?
> The Defendant: Yes, sir.
> The Court: And before you signed your name, did you and Mr. Rebrook read this document and discuss it fully and understand what it means?
> Mr. Rebrook: Well, Judge, I explained to him that the State has the burden of proof... each and every element of the crime, but that in some instances, the defense will stipulate that certain things are in fact true, and that we do that for the

26

purposes of judicial time and of economy, and he – I believe he fully understands that, and I told him that I thought it was in our best interest to stipulate some of these things anyway.

**The Court: All right. Is that correct he said those things to you?**

**The Defendant: Yes, sir.**

...

The Court: And has anybody promised you anything or threatened you in any way to get you to sign this document and agree to this?

The Defendant: No, sir.

The Court: **And you're satisfied with the advice your lawyer has given you in regard to this.**

The Defendant: **Yes, sir.**

The Court: And do you have any questions about this document or what it means?

The Defendant: No, sir.

(*Id.*, pp 245-48) (emphasis added).

25. After the aforementioned Stipulation of Evidence on April 18, 2008, the Court was recessed until April 21, 2008.

26. On April 21, 2008, the jury trial resumed. The Court then instructed the witnesses regarding the Court's sequestration Order. Thereupon the jury heard the opening statements of counsel for both sides, and the physical evidence and testimony presented on behalf of the State. On April 22, 2008, Court reconvened. Thereupon, the State resumed presentation of evidence. At the close of the State's case in chief, and in the anteroom out of the presence of the jury, counsel for Petitioner moved for a judgment of acquittal and motion to dismiss the aforementioned indictment, to which motions the State objected. In said "Motion to Dismiss," which was also filed on April 22, 2008, Petitioner, by counsel, argued that the aforementioned indictment "permits an impermissible and unconstitutional shifting of the burden of proof to the defendant in order to receive mercy from the jury." Based on the arguments of all counsel, the Court denied Petitioner's motion for judgement of acquittal. The Court also denied the aforementioned "Motion to Dismiss," reasoning that:

> the statute cited by counsel is not an unconstitutional statute. There is no burden shifting in regard to the matter of mercy. The defendant could have, under a West Virginia case, the *LaRock* case, request a bifurcation where he could have remained silent if he chose to do so throughout the innocent or guilt stage, and at the second portion of the case, he could have presented all of the mitigation that he felt needful and necessary to deal with the question of mercy or no mercy. That's when the jury would make that decision."

(Trial Transcript, Vol. III, pp 623-28).

27

27. On April 22, 2008, after the close of the State's case in chief and the Court denied Petitioner's aforementioned "Motion to Dismiss, the Court then advised Petitioner of his right not to testify or testify. *See* Trial Transcript, Vol. III, pp 628-31. Upon the Court's inquiries, Petitioner made a voluntary counsel-assisted decision to testify in his own defense and clearly stated that he was satisfied with his counsel, as shown by the following excerpts of trial testimony:

> The Court: Mr. Martin, you've talked with your lawyers about these rights I've just explained at some point, haven't you?
> The Defendant: Yes, sir.
> The Court: Okay. And based on that discussion and what I've explained to you, do you have any questions about your right to remain silent or to testify?
> The Defendant: No, sir.
> The Court: All right. **Have you made a decision after talking to your lawyers whether you will or you will not testify?**
> The Defendant: I will testify.
> The Court: All right. Has anybody promised anything or threatened you in any way to get you to do that?
> The Defendant: No, sir.
> The Court: All right. I – and **you're satisfied with your lawyers.**
> The Defendant: **Yes, sir.**

(*Id.*, pp 630-31) (emphasis added).

28. During the two-day jury trial, forty (40) State's Exhibits and four (4) Petitioner's Exhibits were admitted into evidence. Seventeen (17) witnesses were called by the State and four (4) witnesses, including Petitioner, were called by Petitioner. Said Exhibits and witnesses' testimonies presented the facts below, which are necessary to address the issues as to the relief sought by Petitioner.

29. Petitioner, a retired coal miner from Pittston Coal Company after twenty-one (21) years of service, was 57 years old in 2007, the year of the crimes, living with his wife and son Gary Dewayne Martin (hereinafter "Petitioner's son") on Stringtown Road, Fayette County, West Virginia. (Trial Transcript, Vol. III, pp 689-90). Petitioner testified that he was half deaf in his hearing ability (*Id.*, p 712). From arraignment through his jury trial neither Petitioner, nor his counsel, ever requested any hearing assistance devices. Also, during the trial Petitioner never gave any indication that he had any problem hearing or understanding what was being said.

30. The following pages are about evidence presented during trial.

31. On May 27, 2007, Petitioner's son spent the night camping in a cabin on a hill, one-half mile from Petitioner's home. He carried an AK-47 assault rifle on the camping trip, and he had been shooting targets with the gun on the evening of May 27, 2007. (Trial Transcript, Vol. II, p 634). Petitioner testified that he purchased the aforementioned rifle as a graduation present for his son about three or four weeks prior to May 27, 2007. (Trial Transcript, Vol. III, p 714). Petitioner claimed that he had never fired the aforementioned rifle, but that he was very knowledgeable about firearms and that he was familiar with the aforementioned rifle, as shown by the following testimony:

> Q: had you fired that particular rifle [the AK 47] before?
> A: No, I never fired it.
> Q: are you familiar with guns like that?
> A: oh, yes, sir.
> Q: and can you tell me how those spent cartridges eject out of that gun?
> A: forward and to a 15-degree angle from the bore line. ... from the trajectory of the bullet, ejected cartridge goes 15 to 20 degrees forward from the – you know, like this is the way you're aiming, the cartridge goes that way.
>
> ....
> Q: and how do you know this?
> A: all Chinese and Russian weapons eject to the front.
> Q: I take it then that you're fairly knowledgeable about firearms?
> A: **Yes, sir. I have a complete military gun collection from Springfield muskets up – trap door Springfields, everything the United States Military has had right up to the present.**
>
> (*Id.*, pp 737-38) (emphasis added).

32. Cox, 24 years old, a graduate of Midland Trail High School, worked with his father in their family business. Hughes, 22 years old, a graduate of Midland Trail High School, worked as a welder. Legg, 23 years old, a graduate of Midland Trail High School, worked as a welder. Cox, Legg, and Hughes were friends and on May 28, 2007, Memorial Day, they rode together on Stringtown Road, a public highway, a rural part of Fayette County on the north side of New River. Cox and Hughes were each riding a four wheeler ATV machine, and Legg was riding a dirt bike motorcycle. Cox carried a holstered pistol and he had a permit to carry a gun. (Trial Transcript, Vol. II, p 436). They stopped on Stringtown Road in front of Petitioner's home, across said road from Petitioner's house.

33. Petitioner and Petitioner's son claimed that they did not know Legg, Cox, or Hughes, nor had they ever seen any of them before they appeared in front of Petitioner's home. (Trial Transcript, Vol. III, p 647, p 720).

29

34. Petitioner's son heard the four-wheelers, while he carried the AK-47. on his way to Petitioner's home from the aforementioned overnight camping (*Id.*, p 635). Petitioner's son went down into the woods to check on what he heard and stopped behind a trash can. Petitioner's son testified that he saw Cox and Hughes stopped on their four-wheelers on Stringtown Road and that he guessed that they were smoking marijuana because he observed that "they were smoking out of a pipe – between one another." (*Id.*, p 638). Then he saw Legg, on a dirt bike motorcycle, join Cox and Hughes. At that point, Cox, Hughes, and Legg were all on Stringtown Road, a public highway, while Petitioner's son was sitting behind a trash can. (*Id.*, p 639).

35. Petitioner's son claimed that a confrontation occurred between him, Legg, Cox, and Hughes. Petitioner's son testified: "they went down the road and continued going. I heard them come to a stop up the road, and they turned around and came back and came to a stop right in front of where I was sitting. I tried to remain hidden, I just didn't want to be acknowledged. The man on the dirt bike hollered at me." (*Id.*, p 639). Petitioner's son got up and "took a knee with rifle in right hand, holding it by the barrel, using it to stand up with," when Legg, on the dirt bike, began yelling. Petitioner's son, however, admitted that neither Cox nor Hughes said anything to him. In fact, neither Cox nor Hughes ever dismounted their four wheelers nor came up the hill towards Petitioner's son, as shown by the following:

> Q: Did either of the fellows on either of the four wheelers say anything to you?
> A: They were talking quietly between each other, but I do not know what they were saying.
> Q: did either – did any of them ever get off the bike and come up the hill towards you?
> A: No, sir.

(*Id.*, p 642).

36. Petitioner's son testified that Legg continued to threaten him with a weapon. However, he clearly admitted that he did not know whether Legg did in fact have any weapon. (*Id.*, p 641). Petitioner's son admitted that it was obvious for Legg, Cox, and Hughes to see that he carried the AK-47 at that time, (*Id.*, p 641), as the following testimony shows:

> A: **The weapon, if he did have one – I don't know to this day.** Every time he would make me a threat with a gun, he would pat his right thigh with his right hand.
> Q: So you're saying…. he would say something and then pat his right side?
> A: Yes, sir.
> Q: And that made you believe he might have a weapon?

A: In his pocket, yes, sir.
Q: And it would have been obvious to them that you have a weapon, would it not?
A: yes,

(*Id.*, p 641) (emphasis added).

37. Petitioner testified that around 12:30 pm on May 28, 2007, he and his wife were at their house and he realized that his son had not returned home from overnight camping. (Trial Transcript, Vol. III, p 711). As Petitioner went out the door of his home to check on his son, he heard his son hollering. (*Id.*, p 711). He then started walking down his driveway and heard profanities or cursing from people other than his son, as the following testimony shows:

A: as I started down the driveway, ... I'd hear cussing and talking going on.
Q: was there arguments going back and forth between your son and whoever these ---
A: Yes.
Q: Were you able to ascertain what the arguments were over?
A: I'm half deaf on hearing, but I could pick up bits and pieces.
...
Q: and was that coming from your son or from the other people?
A: from the other people.

(*Id.*, pp 712-13).

38. Petitioner's son testified that when his father came down to him, his father was not yelling, was being polite, and asked Legg to leave, while Legg, seated on the dirt bike, started to threaten Petitioner. (*Id.*, pp 642-43). At that time, Cox and Hughes were still on their four wheelers and neither of them made any movement nor talked to Petitioner. as shown by the following excerpts of trial testimony by Petitioner's son:

A: [Legg] threatened him with that gun. He would pat his thigh. His exact words were, "we got guns too," .... "I'm going to kill all of you F'ing Martins."
(p 643).
...
Q: did anybody other than the fellow on the dirt bike say anything to your father?
A: no, sir.
Q: did any of them make a gesture of any kind?
A: I wasn't aware of any, no.

(*Id.*, p 644).

39. Petitioner's son testified that at the time that Legg made the aforementioned perceived threat to him and his father, he still had possession of the AK 47, and when his father walked to him and asked for the AK 47 assault rifle, he handed it to him. Petitioner held the gun without putting the gun down anywhere. (*Id.*, p 643).

31

40. Petitioner's son testified that when he handed the AK 47 to his father, **the gun was not ready to fire**, as shown by the following excerpts of trial testimony by Petitioner's son:

> Q: when you originally had the gun and handed it to your father, describe the magazine clip that was in that weapon.
> A: it was a 30-round magazine with ammunition in it, curved. They're called banana clips. And there was another magazine taped around it adjacent that was empty. They were taped back to back.
> Q: they were taped in such a way that when one magazine emptied, you'd pull it out and put the other one back in; is that correct?
> A: right.
> Q: was that what the gun was like at the time you handed it to your father?
> A: yes.
> Q: when the shooting was over, did something happen to that magazine. ... you don't know what happened to the other magazine.
> A: not specifically.

(*Id.*, pp 659-60).

...

> Q: when you came off the hill with State's Exhibit No. 1, there was another clip taped to this. The clip was taped to the end of this, is that right?
> A: yes, sir.
> Q: did that weapon have a bullet in the chamber? Was it ready to fire when you came off the hill?
> A: no, sir.

(*Id.*, p 665-66).

41. Contrary to the aforementioned testimony of Petitioner's son at trial regarding whether the AK 47 was ready to fire, and whether Petitioner held the AK 47 the entire time, Petitioner testified that he laid the AK 47 on the trash barrel after he received the gun from his son and **the gun was ready to fire** as the following excerpts of trial testimony show:

> A: I got the [AK 47] from him and laid it on garbage barrel there.

(*Id.*, p 715-16).

> Q: when you come down, when did you get [the AK 47] from your son?
> A: just as soon as I got down there and ... I laid it – got it and laid it on the barrel.
> Q: So you laid it on the barrel, the trash barrel. And then this argument continued.
> A: it kept escalating.

(*Id.*, p 726).

> **Q: did you have to put a shell in the chamber of this gun?**
> **A: no, sir. It was already loaded.**
> Q: how did you know that?
> A: I don't know. I squeezed the trigger and it went off.
> Q: did you hear [your son] say that there wasn't a bullet in the chamber?

A: he's a teenage child, went through a stressful situation. I'd say he probably don't even remember.

...

Q: so you were able to get this [AK 47] around while that body was pulling his gun out and able to get it around and **shoot him** before he got his gun up to shoot?
A: **I guess I did.**

(*Id.*, pp 732-34) (emphasis added).

42. Petitioner's son testified that when he handed the AK 47 to his father, "they all became very irate." However, he also admitted that both Cox and Hughes remained on their four wheelers without saying anything to him or his father. (*Id.*, p 647). Legg was the only one who talked and he "came at [Petitioner], lunged." However, Petitioner's son also admitted that Legg remained on his dirt bike and was "trying" to get off the bike. Legg said "that's it." (*Id.*, pp 647-48). Subsequently, Petitioner fired the AK 47 semi-automatic assault rifle at Legg, Cox, and Hughes with a lot of movement, as shown by the following testimony of Petitioner's son:

A: **the man came at my father, they all started moving, clearly, a lot of movement,** and the man came at my father, and he was shot. The man on the front four wheeler was trying to clear his weapon. I believe he did clear his weapon from the holster[3]. He was shot next. And the man in the rear was trying to retrieve a machete of some sort, and he was shot last.

(*Id.*, p 650) (emphasis added).

43. Petitioner provided inconsistent testimony at trial regarding whether he made any movement when he started shooting the assault rifle at the victims:

   a. When the State cross examined Petitioner, he testified:

   As I was backing up, and they started with the weapon – and I started firing. And the one on the motorcycle was trying to reach – coming at me and reaching for it, and I was trying to back up, and continued – fired a couple more rounds, and then the guy on the back one, he had his hand down, ... I fired again.

   (*Id.*, p 717).

   b. When he answered the State's last question at the end of the State's cross-examination, Petitioner testified he was in the same location when he fired multiple shots on Cox, Legg, and Hughes.

   Q: when you fired these shots, were you in the same location when you shot all three people?
   A: pretty much so.

   (*Id.*, p 733).

---

[3] "clear from holster" commonly means to remove a pistol from the confines of a holster in which it is carried.

33

c. When Petitioner's counsel re-examined Petitioner, he testified that he was moving around at that time as the transcript excerpt shows:

> Q: Mr. Harris asked you a question whether you were standing still the whole time. Do you remember answering that question?
> A: no, sir.
> Q: if I were to suggest to you that you said you were standing still or in the same vicinity the whole time, but you've told us on this examination that you were moving around, can you explain any discrepancy between that?
> A: I was moving around as I felt I was threatened to try to whichever direction you feel a threat a coming from, you maneuver the opposite.

(*Id.*, p 739).

44. Petitioner testified that he fired first at Cox. (*Id.*, p 719, p 727). However, Petitioner provided inconsistent testimony at trial regarding why he fired at Cox.

   a. In answer to his counsel's question, Petitioner testified that he felt that he had no alternative other than shooting all three of the victims, because when he was up the hill and started to walk down the driveway from his house, he began to pay attention to Cox who looked like he had a gun in hand. (*Id.*, p 719). See the following transcript excerpt:

   > Q: at what point did you see the gun on the hip of the first four wheeler?
   > A: he had it – looked like he had it in – a gun in his hand when he first – when I first started down the driveway, but I was up the hill pretty good before he backed across the road. That's why I was really paying attention to him, because I was – felt like something was there. And the other guy on the motorcycle kept patting his hip while he was cussing and stuff, so I didn't know.

   (*Id.*, p 719).

   b. When the State cross examined Petitioner, he testified that he did not commence shooting until he walked close to his son and he heard that "they was [sic] mentioning something about guns," and he saw that Cox pulled the gun out of the holster completely. (*Id.*, pp 728-31).

   > Q: did you have the gun in your hand when you saw him?
   > A: when I turned around, he had the gun coming out with it.
   > Q: so he had it up out of the holster.
   > A: yes, sir, coming up out of the holster.
   > Q: and so you shot him.
   > A: I turned and fired.
   >
   > ...
   > Q: and you say they talked about going and getting some guns and coming back at one point?

34

A: they was mentioning something about guns.... They had said they would go get more guns or something.

Q: so you didn't start shooting until Mr. Cox, or the boy out front pulled the gun out

A: yeah.

...

Q: completely out of the holster.

A: started to draw.

Q: when he started drawing, had you already picked this gun back up?

A: no, I turned around and grabbed it.

Q: where was his hand on that gun when you turned around and

A: he was pulling his shirt up reaching for the gun. I don't know if he was snapping a break --- snap off of it.

Q: you had seen the gun on his side before?

A: yeah, I seen his gun—I felt he had a gun when I come, first come down the driveway, I was watching him.

Q: so if his shirt was tucked in and the gun was on the outside of it, when you saw him going for his gun.

A: yes sir. His shirt was over the gun.

...

A: when he pulled the gun out, I already grabbed the rifle when he was pulling up his shirt. I turned around and grabbed for it, and as I turned back around, he was already coming out with it.

(*Id.*, pp 728-31).

45. Contrary to Petitioner's aforementioned testimony that Cox was shot first. Petitioner's son testified that Cox was not shot first, but was the second victim shot by his father. (*Id.*, pp 667-68, p 671). However, Petitioner's son provided inconsistent testimony/statements regarding whether he actually saw Cox with a gun in his hand when Petitioner fired on Cox.

a. At trial, Petitioner's son testified that before Petitioner walked to him, he saw that Cox "pulled the pistol out, loaded it and put it back in the holster," (*Id.*, p 644), and "it was a semi-automatic handgun. He jacked the slide back and chambered a round." (*Id.*, pp 644-45). When Petitioner shot towards Cox, he saw the gun in Cox's hand and the gun was approximately at Cox's waist level, as shown by the following testimony:

Q: did you at any time see somebody draw a weapon out of a holster?

A: yes sir. Before my father even arrived, when they first came to a stop in front of my position, the man on the four wheeler in front had a pistol on his side. As soon as he came to a complete stop, he pulled the pistol out, loaded it and put it back in the holster.

(*Id.*, p 644).

...

35

Q: Did you clearly see the gun in his hand?
A: Yes, sir, I did.
Q: All right. When you saw it in his hand, where was it? Here? ...

...

The Court: the record will show that the indication is that the hand and the weapon was at waist --- approximately waist level.

(*Id.*, p 672).

b. At trial, Petitioner's son admitted that in a statement he provided to Deputy Sheriff Sizmore after the shooting that he did not know whether Cox had a gun in his hand or not at the time that Petitioner fired upon Cox, as shown by the following testimony:

Q: when you talked to Detective Sizmore, do you remember him asking you if you saw the gun in the boy's hand?
A: I was – yes, yes, I remember.
Q: Did you tell him that you didn't know, you couldn't tell, that you didn't know whether [Cox] had it in his hand or not?
A: I did not remember at the time.
Q: But you remember today.
A: Yes, sir.

(*Id.*, pp 677-78).

46. Petitioner's son testified that Legg was shot first by Petitioner when Legg was on the dirt bike motorcycle and lunged at Petitioner, "reared his right leg up in the air to get off," and had his back toward Petitioner. (*Id.*, p 667-68). Petitioner's son also testified that his father fired multiple shots at Legg in "pretty quick succession," and at that time Legg did not have any weapon and had both hands on the dirt bike handlebars. (*Id.*, pp 667-69). After Legg was shot, the motorcycle fell on Legg, as shown by the following testimony:

Q: you mean he got off the bike and came toward your father?
A: he was trying.
Q: and then what happened?
A: he was shot.

(*Id.*, p 647).

Q: so this boy who was going to come at your dad who was on the motorcycle is that right?
A: yeah.
Q: you say he lunged at your dad?
A: yes.
Q: so he was on his motorcycle, your dad is to his right?
A: yes.
Q: and he takes his right leg and rears it up
A: yes, sir.
Q: -- to get over the front of the handlebars or behind the bike?

36

A: I'd say he was trying to get his right leg over the front part of the bike.
Q: so he's on his motor bike and he's swinging his right leg up over the handlebars.
A: trying to.
Q: and that would have put his back to your dad?
A: yes, sir, I believe.
Q: so how was he lunging at your dad if he had his back toward him?
A: he was trying to dismount his vehicle in the middle of the road.
Q: and so at what point did your dad shoot him?
A: right there.
Q: do you know where he was hit first?
A: I don't know where any of them were hit.
Q: he never made it from behind the motor bike, did he?
A: he did not.
Q: he did not. In fact, when he was shot, the motor bike fell on him, didn't it
A: yes.
Q: do you know how many shots were fired at him by your dad?
A: no, sir
Q: how fast were they fired?
A: **pretty quick succession.**
Q: but every time you fire this weapon, you have to pull the trigger, right?
A: yes, sir.
Q: what you're saying is that your dad fired on this boy who was trying to get off of his bike by swinging his leg over the handlebars, right?
A: yes, sir.
Q: did he have a weapon in his hand at that time?
A: he had his hands on the handlebars of the bike.
Q: **had you ever seen a weapon on that boy?**
A: **I had the idea he did, but no.**
Q: **you did not see a weapon of any kind on him, did you?**
A: **no, sir.**
Q: you never told the officers that he was patting his pants and indicating he had a gun either, did you
A: no, sir.
Q: did he have both hands on the handlebars?
A: yes, I believe so. It was a blur
(*Id.*, pp 667-69) (emphasis added).

47. Contrary to the aforementioned testimony by Petitioner's son, Petitioner testified that Legg was the second person he fired on. Petitioner testified that when he fired multiple shots at Legg, he never saw whether or not Legg had a gun. When he fired on Legg. Legg's bike was coming up right on Petitioner, and Legg "was on the other side of his bike," and "still astraddle the bike." (*Id.*, pp 727-29).

Q: and so he's the one that you shot first?

37

A: No, no..... I shot the guy that was going for the gun. The one that was in the front, was behind me. That's why I was backing up.

...

Q: did you ever see a gun on [Legg]?
A: he patted his hip in a menacing manner as he was cussing that he had a gun. ...
I never saw a gun.
Q: when it got to the point where the shooting started, where was he?
A: as I backed up, he was still yet at the garbage barrel.
Q: when you started shooting, he was still at the garbage barrel?
A: he was coming at me as I was backing up.
Q: so how was he coming at you? Had he gotten off the bike?
A: no, sir, he had the bike and he shoved it up, come across it reaching at me....
He was lunging at me astraddle the bike as he was coming like he was gonna
jump off it at me.
Q: what did you do next? (after shooting at Cox)
A: at that time, the other guy [on the bike] was right on me, and I turned around
and fired a couple—I fired at him.
Q: and you say he was right on you. Was he on the other side of his bike at that
time?
A: he was astraddle the bike.
Q: he was still astraddle the bike.
A: at me, coming off of the bike at me.
Q: so when you shot him, the bike went down, I assume.
A: yes, sir. I assume.
(*Id.*, pp 727-29).

48. Both Petitioner and Petitioner's son testified that Hughes was the last victim who was shot by
Petitioner.

    a. Petitioner testified that after he fired on Legg, he saw Hughes was facing him and
Hughes's hands were down in a "threatening manner," but he couldn't see Hughes'
hands. (*Id.*, pp 728-30).

> Q: so when you shot him[Legg], the bike went down, I assume.
> A: yes, sir. I assume. Because I was looking at the other guy. He was
> going behind the four wheeler up the road. ... he had his hands down in a
> threatening manner. He didn't try to put them up or show good faith in any
> way whatsoever. ... I seen his hands down in a menacing fashion. ... he
> was facing me. ... I couldn't see his hands. They were behind the four
> wheeler.
> Q: Okay. But you never saw a weapon.
> A: Not – not from that range.
> Q: Well, did you see one after you had shot him?
> A: I didn't get a chance to go get up that far and look. I didn't move the
> body, I didn't touch anything.
> Q: Did you go over and look at them?

A: I walked up and looked around and – but no, I didn't fool with the body.

Q: So when you walked up and looked around, did you see any weapon?

A: I didn't look – I couldn't see under – I didn't move the body. I didn't –the only weapon I see was a machete on the back of the four wheeler.

(*Id.*, pp 728-30).

b. Petitioner's son testified that when his father fired on Hughes, he saw that Hughes was sitting on a four wheeler, facing Petitioner, and Hughes was trying to reach a machete behind his back. (*Id.*, pp 672-75).

Q: and then he turned and fired on the boy who was at the rear.

A: yes, sir.

Q: you say he was trying to get something off the back of his four wheeler.

A: A machete.

Q: and you think this boy was going to try to get his knife off of there and come at your father when your father had his Ak-47.

A: yes, sir, I do.

Q: what position was he in when he was shot?

A: he was turned slightly to the right. He had his right hand behind his back. The boy on the last four wheeler had his right hand behind his back. His left hand was on the handle of the four wheeler. He was sitting on the four wheeler, had his hand behind his back reaching for his machete.

(*Id.*, pp 672-73).

49. Petitioner admitted in trial testimony that on May 28, 2007, he gave a statement to Mark Webb (hereinafter "Webb"), a Fayette County Deputy Sheriff for nearly 13 years, regarding the shootings. (*Id.*, p 734). Said statement was marked as Defendant's Exhibit No. 4 and was admitted into evidence at trial. Said Defendant's Exhibit No. 4 showed, in relevant part, that:

Webb: You saw, you saw the first, the one on the first bike ...

Martin: He, yeath [sic], he made a move because I was watching them. When somebody starts threatening about, you know, going home, and getting guns and threatening to come back and do this, it makes you tense up. And then I seen [sic] the one reach and then they all, it was just like a bomb went off. It...

Webb: Well, you say, you say that, you're waving your hands, just like a bomb went off, did, were, were there sudden movements, were they laying down ...

Martin: Yeah, yeah.

Webb: what?

Martin: Well, the sudden movement, the one in front, I guess he was going to pull the gun on me and I don't know if he was going to shoot me or what.

Webb: You say he was going to pull a gun?

Martin: He did have it in his hands.

Martin: Yeah, he was going for the gun and he cleared leather and by the time that he got it up, I had a hold of the barrel of the rife and I was hollering at him to

39

drop, I can't remember, I really don't know. I think I hollered at him, don't, stop or something like that and he come, I perceived him coming on up with it.

Webb: Now you say that when you saw him clearing leather with the pistol ...

Martin: I can't even remember...

Webb: You day you saw him coming up with a pistol and you said that you already had your hand on the barrel of the rifle.

Martin: Well, I turned to reach for it.

Webb: Okay, you turned to reach for it. Could you see the weapon on him prior to this on the waist?

Martin: Yeah, yeah he made himself, he displayed it, you know.

Webb: Okay, how was he displaying this prior to this?

Martin: He was, he got off the four wheeler and walked around, and kind of had his shirt up to see that, to let me know, the way he was sitting there. you know, they all got off and we talked a little while and then they got back on and I thought they were going to leave and then ...

...

Martin: except the one on the dirt bike, he put his kick, I think he put his kick stand down but he was standing there shut, they all shut their engines off and, all this took place in about four minutes, that's the best I can tell you. But once I see the gun, I don't know what was going on with the other two. I was just like a blur,

...

Webb: and so this guy, you said this guy continued up with the pistol right?

Martin: Right.

Webb: Okay. Is that when you pulled the trigger on your rifle?

Martin: Yeah and it was just like once the first shot went off, I seen the movement of the other...

...

Webb: Okay, you made a motion that you saw movement to your left, now, as you turn, are you firing at the other two?

Martin: Yeah. When I come around with the movement they was [sic/ making, I just kept on firing and I don't know why, I don't know why they...

Webb: you kept on firing, let me ask you this. The weapon that it is. is this a semi-automatic...

Martin: Yeah. It's a semi-automatic.

Webb: You saw that you had shot and you had hit them and they went down?

Martin: Yeah. **I couldn't quit shooting.**

...

Martin: **once I made the decision that I felt threatened, having them threatened my son, having them already told him they was going to go home and get more guns and get their rifles or, they said they had guns like that or something. ...** I felt totally threatened and I shot the man with the gun first, then the movement as I turned real fast, the movement that I seen [sic] was them two making moves, I didn't know what they was going for, what they was doing. I felt the threat, and I continued to fire. It was just something and then as I stepped, I think I stepped behind the four wheeler and looked and the gun had the gun up, laying on the ground, and it seems like, seemed like I fired again at him cause he

had the gun up in his hand or something after he was done on the ground. **I was just a jumble of nerves and it was like I was, I couldn't stop...**
(Defendant's Trial Exhibit No. 4, Statement of Gary Martin, pp 11-17) (emphasis added).

50. Randall Lee Groves (hereinafter "Groves"), who had lived at Box 103 D HC, Stringtown Road, West Virginia for nearly four and half years until 2008, was called as a witness by the State. (Trial Transcript, Vol. II, p 283). Groves testified that on May 28, 2007, he was on his way home. He testified that he saw things and heard noises as he drove on Stringtown Road:

I heard three shots, like somebody was target practicing. A few seconds later, I drove up on a scene of three gentlemen laying in the road and another one standing there holding a gun firing it another three times.
*(Id.,* p 283).

After I seen [sic] [Petitioner] shoot the three times down toward the ground, I was very close by that time, because I continued traveling on to the scene, when I got so close, I realized I was probably in danger myself there.
*(Id.,* p 284).

I started to back up, [Petitioner] stepped out of the road and turned his gun down and flagged me through. When I got up to [Petitioner], the window was down in my jeep, I said, "is everything okay here?" [Petitioner] pointed down and said, "that one pulled a gun on me."
*(Id.,* p 285).

51. Katrenia Hawkins lived on Stringtown Road and was traveling on said Road, coming from U.S. Route 60 on May 28, 2007. *(Id.,* p 294). She testified for the State that:

I saw two ATVs and a dirt bike on the right side of the road, a man laying on the road in front of the ATV, saw the motorcycle off in the middle, a man and a boy standing in the driveway. I stopped and I asked the gentleman in the driveway if he needed me to call 911, and he waved his arm at me and said "Go ahead, I've already called them." A lady came, started screaming coming down the driveway.
*(Id.,* p 296).

[Petitioner] seemed irritated that I had stopped. [Petitioner] was just like "go on, I've already called the police." ... [Petitioner] was irritated, aggravated. He was not upset, just more of a bother, like "you're bothering me."
*(Id.,* pp 301-02).

52. Nathan Coleman (hereinafter "Coleman") and Aaron Feltner (hereinafter "Feltner"), Jan-Care Ambulance employees, were dispatched by 911 to the crime scene near 1:00 p.m., on May 28, 2007. 911 had received a call from a woman reporting a shooting with possibly three victims. They arrived at the scene near 1:15 pm. Coleman testified that one minute after their arrival another ambulance arrived, and five to ten minutes later, law enforcement arrived. *(Id.,* p 339). Coleman testified that when he and Feltner arrived at the scene he saw two four-wheelers and a motorcycle in the road with people laying beside them. Petitioner

41

approached the ambulance vehicle and said to Coleman and Feltner "**they don't need any medical attention**," "**I done it right**," and "**I shot them**." (*Id.*, p 338) (emphasis added).

53. Feltner, an eight-year Jan-Care employee, testified that upon arriving at the scene, he checked each victim for any signs of life. (*Id.*, p 348). Feltner was the only person who went "into the scene" before the police arrived. (*Id.*, p 352). Another paramedic was on the far side of the road, away from the entire scene, but kept parallel with Feltner, to witness what was being done and walked along the outside. (*Id.*, p 352). Feltner did not move the bodies in any way and only checked whether there were any signs of a pulse or breathing by touching the neck of each body. (*Id.*, pp 349-51). Feltner detected no signs of life as to any of the three bodies. (*Id.*, pp 350-51). Feltner also testified that:

> I noticed there were a lot of shell casings around, and there was a pistol that was laying in front of the first victim on the ground….. me being the only one who went and examined the bodies and kept everyone else away, we done that to make sure and preserve any of the evidence and keep the scene as clean as possible and was sure not to disturb any of the shell casings or make sure that no one touched the firearm. I did not move any of the shell casings.

(*Id.*, p 351).

> **I didn't see any weapon besides the pistol that was laying on the ground, in front of the body of the first victim a couple fee away. He was wearing a side-style holster.**

(*Id.*, p 357) (emphasis added).

54. Feltner also testified that Petitioner had a calm, nonchalant demeanor, and seemed like nothing had even happened. He (Petitioner] went over and sat down in his yard and waited until law enforcement arrived. (*Id.*, p 359).

55. Coleman and Feltner stayed at the scene until the bodies of three victims were removed from the scene. (*Id.*, p 339). Coleman testified that after their arrival, and before law enforcement arrived, no one moved anything at all, nor were any of the bodies moved. (*Id.*, p 339). Feltner also testified that they positioned the ambulances in order to "block view and also set up a barrier to make sure no one could come into the scene and out of the scene." (*Id.*, p 353).

56. Fayette County Deputy Sheriff Webb, and Corporal Jack Brown (hereinafter "Brown"), a Fayette County Deputy Sheriff and a certified police officer since 1994, were on duty on May 28, 2007. They arrived at the scene after being dispatched by the 911 Center. (*Id.*, p 362). When they got out of their vehicle, Petitioner, standing on the hillside, started to walk toward them with both hands raised and began shouting, "**I did it, I'm the one you're**

42

looking for, I shot them." (*Id.*, p 363) (emphasis added). Upon searching Petitioner's person, Brown handcuffed Petitioner and placed him in the rear seat of Webb's patrol vehicle. (*Id.*, p 370). Brown testified that "except for the paramedics, from my arrival until well after the detectives arrived at the scene, no one passed beyond me to the scene," (*Id.*, p 372), and they "ran crime scene tape to provide some type of barrier, a visible barrier, for people to know not to go past that point." (*Id.*, p 383). Brown entered Petitioner's home and obtained statements from Petitioner's wife and son. Brown also noticed that **"there were quite a few firearms inside the residence, they were long guns, weren't pistols."** (*Id.*, p 372) (emphasis added).

57. Amy Farrish Nibert (hereinafter "Nibert"), a civilian forensic specialist employed by Fayette County Sheriff's Department, and Detective Sergeant James K. Sizemore (hereinafter "Sizemore"), a Fayette County Deputy Sheriff for 16 years and Chief of Detective Bureau for 7 years in 2007; arrived at the scene together. (*Id.*, p 387). Sizemore testified that when he arrived at the scene, he did not see anyone staying behind the aforementioned taped barrier. Sizemore collected evidence and Nibert, who assisted Sizemore in processing the scene, utilized digital technology to take photographs of the crime scene. After Nibert and Sizemore completed an initial analysis of the scene, Annette Ashley (hereinafter "Ashley"), who was employed by the State of West Virginia as a Fayette County Medical Examiner, went into the scene to "bag the hands of the three people in the road, the purpose was in case there was any gunshot residue on their hands. It was to preserve the evidence. And then the ambulances put the boys in the body bags and transported them to Tyree Funeral Home." where she did a preliminary, cursory examination of the bodies. Then the bodies were locked in body bags and put in the cooler at the funeral home until transport arrived from Charleston to transport the three (3) bodies to the state Medical Examiner's Office. (*Id.*, pp 408-11).

58. Dr. James Kaplan (hereinafter "Kaplan"), then Chief Medical Examiner of West Virginia, and a licensed forensic pathologist, testified that the bodies of Legg, Cox. and Hughes, in locked body bags, arrived at the Medical Examiner's Office in Charleston on May 29, 2007. When Kaplan performed the three (3) autopsies, Sizemore, Fayette County Sheriff William Laird, and State Police Sergeant Bill Scott were present. (*Id.*, p 569, pp 571-73). Kaplan testified at trial as an expert in forensic pathology. Petitioner's counsel had no questions as to Kaplan's expert qualifications. (*Id.*, p 569).

43

59. Regarding the aforementioned pistol that Petitioner and Petitioner's son claimed that Cox wore at his waist on May 28, 2007, and was held in Cox's hand when Petitioner fired on Cox, the aforementioned witnesses, other than Petitioner and his son, provided the following:

a. When Feltner, Jan-Care Ambulance employee, arrived at the scene he saw Cox was laying beside the four wheeler and appeared to have a high velocity gunshot wound to the side of his head. There was a pistol laying on the ground in front of the Cox's body. (*Id.*, p 351).

b. Nibert testified that one of the photographs she took at the crime scene was marked as State's Exhibit No. 19 and admitted into evidence. Said State's Exhibit showed that the person in front was Cox, the pistol was located to the right edge of the photograph, shell casings were found through this area to the right of each vehicle. (*Id.*, pp 394-95).

c. Feltner testified that "[Cox] had a holster on his side. When we examined the holster, there was no weapon in the holster, and **the holster itself had been damaged. The damage corresponded to other damage on the body**. Cox had damage to his right side and his right hand." (*Id.*, p 395) (emphasis added).

d. Sizemore testified that on May 28, 2007, at the crime scene, he recovered a .45 caliber Glock semiautomatic pistol south of the head of Cox on Stringtown Road, (*Id.*, pp 509-10); several of the pistol's component parts and the pistol's magazine were extremely damaged and were found north of Cox's body on the edge of the roadway on the east side of Stringtown Road, (*Id.*, pp 511-12); four (4) live .45 ACP cartridges in the vicinity of the pistol's component parts, one of said cartridges was extremely damaged, and the top part of one of the cartridges was missing. (*Id.*, p 513). Sizemore testified that the holster was on a belt on the right hip of Cox when Cox's body was transported from the crime scene to Tyree's Funeral Home. (*Id.*, p 514). Sizemore observed, at the crime scene, that "[t]here's **something deformed about that holster**," and "[w]hen I first observed the damage to the -- what is referred to as the thumb break safety strap of the holster, that looks like **a bullet hit it**." (*Id.*, pp 518-19) (emphasis added). Based upon the damage and irregularities of the aforementioned Glock semiautomatic pistol, the damaged magazine, and the deformed holster, Sizemore concluded that when the pistol was holstered, a bullet

44

passed between the holster and Cox's body, took out the thumb break safety strap of the holster, went into the pistol's magazine, caused at least one of the .45 cartridges to explode, expelled the base plate of the magazine and ammunition. (*Id.*, pp 519-26). The followings are excerpts of Sizemore's testimony:

> Q: Did you notice anything about the Glock .45 firearm that was consistent with [the bullet hit on the holster]?
> A: Yes, sir, I did. ... there was significant damage to the left side of the grip frame of the firearm that also appeared to be consistent with bullet impact.
> Q: what is the direction of whatever struck that firearm?
> A: from the top of the left side of the grip frame, extending down towards the bottom left-hand corner of the grip frame.
> Q: was that consistent with how it would have been in that holster?
> A: yes, sir.
> Q: and with the damage to the thumb latch of the holster?
> A: yes, sir

(*Id.*, pp 519-20).

e. When Petitioner's counsel cross-examined Sizemore, Sizemore reaffirmed that "it's a

fact that the pistol was holstered at the time it was shot[4]." (*Id.*, p 526).

> Q: Now, I understand that you have a theory that this gun – this pistol was holstered at the time it was shot.
> A: that's not a theory, sir, that's a fact.
> Q: how do you state it's a fact, Sergeant?
> A: **if it was just one element, it would be a theory. When you start off with the damage to the thumb break area of the holster, you add to that the damage to the left frame of the Glock, you add to that the damage to the magazine from this Glock, you add to that add to that the damage to the two cartridge casings that were in the magazine well of the Glock, and you add to that the damage to Mr. Cox's side, it's not a theory, sir, that's a fact.**
> Q: that's something you have concluded based upon these things you put together, isn't that true?
> A: No, sir, there is no other way that could have occurred.

(*Id.*, pp 526-27).

...

> Q: And you're testifying it is your opinion that [the pistol] was hit while it was in the holster on [Cox's] hip.
> A: that's not an opinion, sir, it is a fact.
> Q: your opinion. Now, how is it if this gun was on his side and this holster was clipped and this up against his side, the belt, how is it that the bullet hit the back left side of the gun instead of the front right side of the gun?

---

[4] "was shot" does not mean that the pistol was discharged; it means that a bullet struck the pistol.

45

Because the part that's injured was the part that was against his hip; isn't that a fact?

A: **everything is consistent, sir, with the bullet impacting through the thumb break safety snap, impacting into the left grip frame of the firearm, actually penetrating the left grip frame and striking the magazine inside and blowing out the bottom, knocking the base plate and base plate minor of the magazine completely off the weapon.**

...

Q: you have no idea how many bullets were fired; you have no position – idea what position the body's in when they were hit. You don't know that.

A: **Sir, I know that it's beyond any doubt whatsoever that Mr. Cox did not have this firearm in his hand, nor was his hand on this firearm when it was struck by a bullet. Because had his thumb been in this firing position, his right thumb would have sustained injury from that same bullet, and there was no injury to his right thumb.**

(*Id.*, pp 536-38) (emphasis added).

f. When Ashley, Fayette County medical examiner, conducted the aforementioned examination of the three (3) bodies at Tyree's Funeral Home, Ashely found that Cox had a gunshot wound to his right cheek, the back of his head, behind the right ear, and to his right side. Ashley testified that Cox "did have on a belt that had a gun holster on that side, holster near the location where that wound was. That holster was removed and taken by Sergeant Scott, a WV State Trooper." (*Id.*, pp 409-10).

g. William J. Scott (hereinafter "Scott"), a WV State police trooper of 14 years service in 2007, was off duty on May 28, 2007. (*Id.*, pp 417-18). Scott testified that on May 28, 2007, Charlene Hughes, mother of victim Hughes, who was also his friend, called him about the shooting, and Scott met Hughes' mother at her residence in Oak Hill and they went to Tyree Funeral home. (*Id.*, p 418). Scott notified Sheriff Laird and Chief Kessler regarding his actions. At Tyree Funeral Home, Scott observed the aforementioned examination of the three (3) bodies, and also gathered, documented, and packaged the personal effects from each body. (pp 419-20). He testified that he collected a fragment removed from Hughes' leg and packaged it in a brown paper bag. (*Id.*, pp 419-20). Scott testified that after Ashley removed the aforementioned holster from Cox's body, he packaged it in a brown bag and there were no other items in the same brown bag with the holster. Scott delivered the brown bag with the holster inside to Sizemore on May 29, 2007. (*Id.*, p 425). Scott testified that "What's distinctive about that holster is at the place where it snaps, that actually holds

46

**the pistol in, it appears to have some damage.**" (*Id.*) (emphasis added). Scott testified that on the night of May 28[th], 2007, he did not possess any gun holsters that resembled the holster removed from Cox's belt. (*Id.*, pp 432-33). Scott also testified that after the holster was removed from Cox's body, the holster was packaged and in his care, custody, and control until it was delivered to Sizemore, and the item was not tampered with in any shape or form. (*Id.*, pp 422-24, pp 514-15).

h.  At trial, the holster was marked as State's Exhibit No. 33 and was admitted in evidence over the objection of Petitioner's counsel. Petitioner's counsel objected to admission of the State's Exhibit No. 33 because he argued, "this particular item was obtained by an off-duty police officer, .... I don't know what happened to it from the time he obtained it to the time he turned it over. We contend based upon photographic evidence taken at the scene that we have, we believe that the holster itself, if it's the same holster, was altered. But because of the way it was obtained, we object to its admission. There was a break in the chain of custody." (*Id.*, pp 516-17). Sizemore testified that when he was at the Chief Medical Examiner's Office observing the autopsies of the aforementioned decedents, the holster was delivered to him by Scott, and the holster was in the same condition then it was as he observed it being on the body of Cox at the scene. (*Id.*, p 518). The Court overruled the objection and admitted State's Exhibit No. 33 because "it goes to weight, not admissibility," the Court opined. (*Id.*, p 517).

60. The aforementioned preliminary, cursory examination by Ashley and Kaplan's autopsy of Cox showed the following:

a.  Ashley testified that in her preliminary, cursory examination she found that Cox had a gunshot wound to his right cheek, the back of the head, behind the right ear, and to his right side. (*Id.*, p 490).

b.  Kaplan testified that Cox was 24 years old at the time of his death and there were no drugs or alcohol in Cox's blood at the time of his death. (*Id.*, p 576). Cox received two gunshots to the head, front to back, and one gunshot wound to the right hip, front to back. Cox died as a result of two gunshot wounds to his head and the injuries of both these gunshot wounds caused injuries that were not compatible with life:

47

I was certain that [Cox] wouldn't be able to move or do anything after having received the gunshot wound to the upper cheek. After having received the gunshot wound to the lower cheek, it's possible for Cox to have coherent movements, no purposeful movements, which means he would have not had control.

(*Id.*, p 596).

There was no evidence of close-range firing, and these bullets were through and through, that is to say, there was no bullet material retained at autopsy.

(*Id.*, p 571-73).

c. Regarding the gunshot wound to Cox's right hip, Kaplan testified that:

There was evidence that the bullet had struck something prior to hitting Cox, because there was material splash, that is to say, there were small areas of punctate laceration around the gunshot would itself that probably represent either material set in motion by the bullet impact or by the parts of the bullet itself breaking off.

(*Id.*, pp 571-73).

61. The aforementioned preliminary, cursory examination by Ashley and the autopsy by Kaplan on Legg showed the following:

a. Ashley testified that the preliminary, cursory examination of Legg it was found that he had multiple gunshot wounds in the left temple, the back of the left head, the areas behind the left ear, underneath the right arm, the chest, underneath the right arm, in his left upper back, and above the right elbow. Ashley found Legg had several items on his person, including a wallet, cigarettes, lighter, banadanna, and Ashely did not remove any physical evidence from Legg's body in the preliminary, cursory examination. (*Id.*, p 411).

b. Kaplan testified that Legg was 23 years old at the time of his death and Legg had no alcohol or drugs in his blood at the time of death. (*Id.*, p 582). Legg suffered multiple gunshot wounds to his person: a gunshot wound to the back of his head, which exited the front left forehead; a gunshot wound to the front of Legg's chin, which exited the left angle of the jaw; a tangential gunshot wound through Legg's lateral right upper arm, a complex gunshot wound, which was a graze wound and created a groove in the arm; an entrance gunshot wound to the back side of Legg's right upper arm, which passed with the arm in anatomic condition and back to front and upwards, exited the inside surface of Legg's right upper arm and then reentered at the armpit, the right armpit of Legg's right chest, and existed his left mid back. (*Id.*, pp 577-79).

48

c. Regarding aforementioned gunshot wound to the back of Legg's head, Kaplan testified that the gunshot wound through the back of Legg's head caused injuries that were incompatible with life (*Id.,* p 579), and the nature of the wound indicates that Legg's head was against some hard surface at the time the bullet entered the back of his head and existed the left temple on his head. (*Id.,* pp 580-82, pp 608-9).

> Q: did you notice anything unusual about the exit wound of the bullet that passed form the back of the head through his face?
> A: the gunshot wound to the back of Legg's head exiting over the left temple. This type of wound, called a shored exit gunshot wound, it means that **Legg's head was against some surface at the time the bullet exited his person in that area. We have to conclude that Legg's head was against some sort of a surface at the time he sustained the gunshot wound to the back of his head. It would have had to have been something solid, something that did not give way, that would have been very firm.**
> Q: Could it have been the pavement on the road?
> A: that's a possibility.

(*Id.,* pp 580-82) (emphasis added).

> Q: you had indicated with Legg that there was some evidence that one of the wounds was against a hard surface, ...
> A: it's the wound that has the wound that caused the exit wound to the left temple. The wound that enters the back of Legg's head and then exists here, **the nature of the wound indicates that Legg's head was against some surface, some hard surface, at the time the bullet existed his head. ....** The bullet enters the back of the decedent's head and exists approximately the left temple.

(*Id.,* pp 608-9) (emphasis added).

d. Regarding the aforementioned gunshot wound to the back side of Legg's right upper arm, Kaplan testified that at the time the shot entered Legg's arm, "the arm could be extended, it could be flexed at the elbow at the time the shot entered his arm," (*Id.,* p 582), further, "there was no retained bullet material." (*Id.,* p 587). The wound caused very significant injuries to the spinal cord and to the lungs on both sides with very significant bleeding, and would have prevented further movement of Legg after this gunshot wound was received. (*Id.,* 577-79).

e. Kaplan also testified that except for the aforementioned gunshot wound to the back of Legg's head, he would have survived the other aforementioned gunshot wounds.

> Q: would he have survived any of those gunshot wounds?
> A: yes. There's a gunshot wound to the tips of 2 and 3 of his right hand that were trivial. They would have required surgery. The gunshot wound

49

to the chest, it's possible he might have survived had he received prompt medical attention, although he never would have been able to walk again. The gunshot wound to the chin was potentially survivable, but the gunshot wound through the back of Legg's head caused injuries that were incompatible with life.

(*Id.*, p 583).

62. The aforementioned investigations and examinations presented the followings regarding Hughes:

a. Feltner testified that when he was at the scene, he observed that Hughes' body "was laying in a fetal position. His knees curled up to the chest and arms tucked in. he was laying in behind the four wheeler, that he appeared to have gunshot wounds to his body and a high velocity gunshot wound to the head." (*Id.*, pp 350-51).

b. Sizemore testified that at the scene, except for the aforementioned Glock semiautomatic pistol near Cox and the AK-47 rifle on the trash barrel, he also recovered a knife on the cargo rack area of the Hughes' four wheeler, (*Id.*, p 742), and the knife "had cable ties binding both the sheath and the handle to the rack of the four wheeler. **We couldn't pull the knife out of the sheath. You'd have to cut the cable ties to get it out.**" (*Id.*, p 743) (emphasis added).

c. Ashley testified that during the aforementioned preliminary examinations of Hughes, multiple gunshot wounds were found on his face, right beside of his right nostril, in his left thigh, his left buttock, and his left upper back. (*Id.*, p 413). A bullet fragment from Hughes' leg was bagged by Scott. *Id.*

d. Kaplan testified Hughes was 22 years old at the time that he died. (*Id.*, p 585), and "Hughes died as a result of multiple gunshot wounds, specifically the gunshot wound to his left upper back which lacerated the brain stem and caused death." (*Id.*, p 587). Kaplan also provided the details of Hughes' multiple gunshot wounds:

There was a gunshot wound to Hughes's left buttock which went sharply upwards and form left to right, and traversed the soft tissues of the body causing some injury to the left kidney. This trajectory is very shallow, goes very sharply upwards.
There was additionally a gunshot wound to Hughes' left upper back that passed again sharply upwards, traversed the soft tissues of the neck and then exited Hughes' face.
The right cheek has an exit gunshot wound passing in this fashion, and there was no retained bullet material. This gunshot wound caused laceration to his brain stem which was incompatible with life. It caused

50

bruising to his brain and laceration to the brain stem in an area that was incompatible with life.

′ There was additionally bullet material impact to an area in the front of Hughes' left upper arm and also to the front part of his left upper leg. These injuries were trivial, would not have caused significant injury. But the gunshot wound to the buttock was very serious, was the cause of the fatal injury, but he might have survived.

(*Id.*, pp 586-87).

e. Sizemore testified that a 7.62 by .39 millimeter bullet was recovered from the right upper back of Hughes during the autopsy and was submitted to the WV State Police Crime Lab. It was identified as being fired from the AK 47 assault rifle which Petitioner used to shoot his vicitms. (*Id.*, pp 504-05).

f. Kaplan testified that there was no alcohol in Hughes' blood at the time of his death. (*Id.*, p 592). The toxicology test on Hughes showed that "there's evidence of ongoing Diazepam use." Kaplan testified that Diazepam is a benzodiazepine medication, used for anxiety or for muscle spasm, and the amount of Diazepam in Hughes' system was low and would not have had any psychological or behavioral effects on Hughes. (*Id.*, p 590). Kaplan explained:

> There's a range of medications that doctors prescribe drugs to folks to try to get back at right concentration, and there's a broad range of concentrations within the blood test that are acceptable for the intended use of the medication. ... in this case, the Diazepam that we indicated was very close to the lower range of the amount of drugs that doctors prescribe for the intended use of that medication. It's my opinion, as a medical doctor, the level of diazepam would not have altered significantly Hughes' behavior. There's indication that Hughes had been using this medication for some period of time before he was killed, it was ongoing use, and his body would have become used to the medication. It would not have had any psychological or behavioral effects on Hughes.

(*Id.*, p 590).

g. When Petitioner's counsel cross-examined Kaplan regarding Diazepam found in Hughes' blood, Kaplan testified:

> Dr. James Kraner, a forensic toxicology, who would be responsible for doing the testing/toxicology that we utilize to determine the concentration of drugs. Dr. Kraner had a toxicology report dated August 15, 2007, Dr. Kraner found that there was no alcohol in Hughes' blood. Diazepam was present in basically .04 milligrams per liter. The therapeutic range of that would be .0224 milligrams per liter, so this was a factor of one hundredth the level of the highest acceptable therapeutic level of this particular

51

medication. He also found that there was nordiazepam, which is a metabolite of diazepam, an active metabolite of diazepam, that was present again in very low therapeutic concentration, it's one-twentieth the upper acceptable range of nordiazepam in therapeutic use of diazepam. (*Id.*, pp 592-93).

h. Petitioner's counsel asked Kaplan whether it was possible that Legg, Cox, or Hughes had ingested marijuana. Kaplan testified that it was not likely that they had ingested marijuana. (*Id.*, p 607).

> Q: It's possible, is it not, that these people had ingested marijuana within a half hour prior to the incidents which resulted in their death. … it's possible that they used marijuana.
> A: it's possible. It's not likely, but it's possible.

(*Id.*, p 607).

63. Kaplan testified that the gunshot wounds suffered by Legg, Cox, and Hughes were all distant-range gunshot wounds because he found no powder burns or stippling on any of the three (3) bodies and there was no evidence of close-range firing on the three (3) bodies. (*Id.*, pp 603-4).

64. Carl Blaine Cox, Sr., Cox's father, testified that between 8:00 am and 9:00 am, on the morning of May 29, 2007, the day after the shooting, he went back to the crime scene and he found "a clip, a set of shooting glasses, a green bandana and a blue rag that had blood on it," within ten feet of Hughes' four wheeler. (*Id.*, p 438). Carl Blaine Cox, Sr. further testified that:

> This gun clip was right behind the trash can in behind a pine tree. It was seven feet from Hughes' four wheeler. He was the last four wheeler there. and from there, you step up on the bank and there sits the pine tree, and this stuff was laying in behind the pine tree, and there was also five cigarettes butts there and an empty beer can, bud light. …. The clip, the bandanna and the glasses/shooting glasses or goggles were somewhere behind that trash can. They were buried with that clip in the leaves.

(*Id.*, pp 422-23).

> the first thing I did was notify my daughter and had her call the sheriff's department, then I went up to Mr. Legg's house, because I wanted some witnesses down there when the police arrived, and got several of the Legg family down there. They were present. Once I found the stuff, I left it just like it was, I never messed with it. Detective Glenn Chapman came. They did not pick it up; I showed them from the hard road where it was at. They went and got a search warrant and went back up there and got it.

(*Id.*, p 440).

65. Sizemore, in answering Petitioner's counsel's question as to why neither he nor any other police officer at the crime scene on May 28, 2007 did not find the aforementioned items found by Carl Blaine Cox, Sr., testified that:

> There were a minimum of nine rounds fired from the AK-47. I did not go up in the woods there behind that day where they found the additional magazine to the Glock to the AK, that was private property and in order for me to have examined that, I would have required a search warrant, and to get such a search warrant, I would have required probable cause to get a search warrant for that. At that time Petitioner was already taken to the Sheriff's office.

(*Id.*, pp 526-29).

66. On April 22, 2008, at the conclusion of Petitioner's case in chief and in the anteroom out of the presence of the jury, counsel for Petitioner renewed their motion seeking a judgment of acquittal, to which the State objected. The Court denied said motion. (Trial Transcript, Vol. III, p 747).

67. The Court read to the jury its General Charge and its Instructions of Law No. 1 through and including 12. Neither the State nor Petitioner offered any instructions of law they wished read to the jury. After the reading of the aforementioned charge and instructions, closing arguments of counsel for both sides were made to the jury. The jury then retired to its jury room to consider of its verdicts. After more than two (2) hours of deliberation by the jury, Petitioner was found guilty of: Murder, in the first degree of Hughes, as charged in Court One of the Indictment with a recommendation of mercy; Murder, in the first degree of Legg, as charged in Court Two of the Indictment, with a recommendation of mercy; and Murder, in the second degree of Cox, a lesser included crime charged within Count Three of the Indictment. The Court inquired of the jury if said verdicts were the verdicts of each and every one of the jurors and all jurors responded affirmatively. The Court accepted the jury's verdicts, and based thereon, Petitioner was adjudged and found to be guilty of the felony crimes aforementioned.

68. A sentencing hearing for Petitioner was conducted in the aforementioned felony case on June 2, 2008, whereat Petitioner, appeared in court with his two aforementioned defense counsel. Prior to said sentencing hearing, the Probation Department of the Court, by Probation Officer Jerry L. Willoughby, submitted to the Court a "Presentence Investigation Report," which was dated on May 20, 2008 and copies of which were sent to Petitioner, his counsel and State's

counsel before Petitioner's sentencing hearing. Said Presentence Investigation Report stated, in relevant part, that:

> Mr. Martin is a 1970 graduate of Meadow Bridge High School located in Meadow Bridge, West Virginia.
>
> Mr. Martin has **never enlisted in the United States Armed Forces.**
>
> Mr. Martin retired from Pittston Coal Company in 2002 after 21 years of service. Prior to working in this position, Mr. Martin was also employed through the West Virginia Department of Highways from 1970 to 1973.
>
> ...
>
> The family has no bills or financial obligations to speak of. Mr. Martin states that he worked seven (7) days a week during his mining career in order to make sure his family was financially set in time for his retirement. His home was paid for and the family paid off all of the major bills.
>
> ...
>
> **Mr. Martin denies being referred to or seeking out any mental health, psychiatric or substance abuse treatment presently or in the past. He also denies the use of drugs or alcohol in the past or presently."**

Presentence Investigation Report, Indictment No. 07-F-159, pp 6-7 (emphasis added).

69. At the aforementioned sentencing hearing on June 2, 2008, the Court inquired if there were any corrections to the aforementioned Presentence Investigation Report and being advised that there were none, offered all parties, including Petitioner, an opportunity to, in open court speak, prior to imposition of sentences. The Court heard statements from Petitioner and counsel of Petitioner. The Court also heard a statement from one member of each victim's family. Also, counsel for the State addressed the jury. The Court, having fully considered all of the aforementioned, then imposed the following sentences on Petitioner: for each of the felony crimes of murder in the first degree, with mercy, of two victims, life in the Penitentiary, with eligibility for parole, pursuant to the law and jury verdicts; Petitioner was also sentenced to the Penitentiary for a determinate period of forty (40) years, for the felony crime of murder in the second degree of the third victim. The Court further ordered the three (3) sentences served consecutively. The Court entered the Sentencing and Commitment Order on June 9, 2008.

70. On June 23, 2008, the Court, by Order, appointed Jack Hickok, West Virginia Public Defender Services, to represent Petitioner with regard to any post-conviction relief in his case. The Court also caused a copy of the said Order to be mailed to Petitioner on July 2, 2008.

54

71. Petitioner's Notice of Intent to Appeal was filed, by the aforementioned appellate counsel, on July 1, 2008. On December 15, 2008, Petitioner's aforementioned appellate counsel filed a Petition for Appeal with the Clerk of the Supreme Court of Appeals of West Virginia. The Petition raised the following assignments of error:

    a. "The chain of custody in this case is a trail of broken links

    b. The sentence imposed on Gary Martin should shock the conscience of the Court

    c. There was insufficient evidence to warrant a finding of premeditation, and, the jury was not properly instructed."

72. The aforementioned Petition for Appeal was refused by the Supreme Court of Appeals of West Virginia by an Order entered April 8, 2009.

73. On May 21, 2010, Petitioner, *pro se*, filed a pleading captioned "Motion for Reconsideration and Reduction of Said Sentence under Rule 35(b) of the Rules of Criminal Proceedings." Said motion was denied by the Trial Court in an Order entered May 24, 2010.

## CONCLUSIONS OF LAW

1. Jurisdiction and venue are appropriately in the Circuit Court of Fayette County, West Virginia.

2. W. Va.Code § 53-4A-1(a) states, in pertinent part, that:

    Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void **under the Constitution of the United States or the Constitution of this State, or both,** or that the court was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief, if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which Petitioner has instituted to secure relief from such conviction or sentence.

3. Accordingly, "[a] habeas corpus proceeding is not a substitute for a writ of error and ordinary trial error not involving constitutional violations will not be reviewed," Syl. Pt. 4, *State ex rel McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979); and "habeas relief is available only where: (1) there is a denial or infringement upon a person's constitutional rights; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the legal maximum; or (4) the conviction would have been subject to collateral attack by statute or at common-law prior to the adoption of W. Va.Code § 53-4A-1." *Pethel v. McBride*, 219 W. Va. 578, 589, 638 S.E.2d 727, 738 (2006). Further, claims that have been "previously and finally adjudicated," either on direct appeal or in a previous post-conviction habeas proceeding, may not be the basis for habeas relief. W. Va. Code § 53-4A-1(b); *Bowman v. Leverette*, 169 W. Va. 589, 592, 289 S.E.2d 435, 437 (1982). Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived, Syl. Pts. 1 & 2, *Ford v. Coiner*, 156 W. Va. 362, 196 S.E.2d 91 (1972). If the claims were merely raised in a petition for appeal that was refused, those claims are not precluded. *Smith v. Hedrick*, 181 W. Va. 394, 382 S.E.2d 588 (1989).

4. Moreover, the right of a criminal defendant to assistance of counsel includes the right to effective assistance of counsel. W.Va. Const. art. III, § 14; U.S.C.A. Const. amend. VI; *See, e.g., Marano v. Holland*, 179 W.Va. 156, 366 S.E.2d 117 (1988); *State v. Reedy*, 177 W.Va. 406, 352 S.E.2d 158 (1986). Constitutional claims of ineffective assistance of counsel may be raised in a habeas corpus proceeding and "are governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and subsequently adopted by [the Supreme Court of Appeals of West Virginia] in *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995)." *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 17, 528 S.E.2d 207, 213 (1999).

5. To prevail in post-conviction habeas corpus proceedings, the "petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release." *State ex rel. Scott v. Boles*, 150 W. Va. 453, 456, 147 S.E.2d 486, 489.

6. Pursuant to Rule 7(a) of the Rules Governing Post–Conviction Habeas Corpus Proceedings: "[i]n post-conviction habeas corpus proceedings, a prisoner may invoke the processes of discovery available under the West Virginia Rules of Civil Procedure if, and to the extent

that, the court in the exercise of its discretion, and for good cause shown, grants leave to do so," the Supreme Court of Appeals of West Virginia has held that:

> [i]n proceedings under the West Virginia Post-Conviction Habeas Corpus Act, W. Va.Code §§ 53–4A–1 to –11, discovery is available only where a court in the exercise of its discretion determines that such process would assist in resolving a factual dispute that, if resolved in Petitioner's favor, would entitle him or her to relief.

Syl. Pt. 3, *State ex rel. Parsons v. Zakaib*, 207 W.Va. 385, 532 S.E.2d 654 (2000).

7. "A court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for Petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that Petitioner is entitled to no relief." Syl. Pt. 2, *Perdue v. Coiner*, 194 S.E.2d 657, 156 W.Va. 467 (1973).

8. In the instant case, Petitioner presents twenty-two (22) grounds for relief, which can be categorized into three general areas: (1) Prosecutorial Misconduct; (2) Judicial Misconduct; and (3) Ineffective Assistance of Counsel. The Court, having completed its careful review of the Petition and the contents of the criminal case file, including trial transcripts, now concludes that the relevant facts of the case *sub judice* have been sufficiently and adequately developed and that the Court can now rule upon the Petition as a matter of law without a hearing.

9. Petitioner alleges two grounds regarding prosecutorial misconduct: Grounds One and Ten. In Ground One, Petitioner claims that the prosecution abused its discretion by "constructively blocking the grand jurors from properly investigating and fully confronting the evidence in this case." Petitioner argues that "the prosecution chose to present only one witness, the State's investigating officer, who gave a summary 'ex parte' presentation of the case and charges which constructively blocked favorable evidence, having a 'chilling effect' on the process which prevented the grand jury from completing its investigative function."

10. The Supreme Court of Appeals of West Virginia has consistently held, under W. Va. Code § 7-4-1, that the prosecuting attorney has a nondiscretionary duty to institute proceedings against persons when he has information giving him probable cause to believe that any penal law has been violated. *See, e.g., State ex rel. Ginsberg v. Naum*, 173 W.Va. 510, 318 S.E.2d 454 (1984); *State ex rel. Skinner v. Dostert*, 166 W.Va. 743, 278 S.E.2d 624 (1981). "The only limitation upon the prosecutor's duty to bring criminal charges when information is

57

received that any crime has been committed in his county is the requirement that the proceedings instituted and prosecuted be 'necessary and proper.'" *State ex rel. Hamstead v. Dostert*, 173 W.Va.133, 138, 313 S.E.2d 409, 415 (1984).

11. In *State ex rel. Pinson v. Maynard*, 181 W.Va. 662, 383 S.E.2d 844 (1989), the Supreme Court of Appeals of West Virginia recognized that: "[c]riminal defendants have frequently sought to challenge the validity of grand jury indictments on the ground that they are not supported by adequate or competent evidence." *Id.*, at 665, 383 S.E.2d at 847. "This contention, however, often runs counter to the function of the grand jury, which is not to determine the truth of the charges against the defendant, but to determine whether there is sufficient probable cause to require the defendant to stand trial." *Id.* "The traditional function of a grand jury is to determine whether there is sufficient probable cause to require a defendant to stand trial, rather than to engage in an analysis of the truth of the charges." *State v. Messer*, 223 W. Va. 197, 205, 672 S.E.2d 333, 341 (2008).

12. The Supreme Court of Appeals of West Virginia has also clearly recognized that "there is a distinction between the functions of a grand and petit jury. ... the grand jury is an accusatory body, not a judicial body, and as such has the right and obligation to **act on its own information, however acquired**." *State v. Bonham*, 184 W. Va. 555, 561. 401 S.E.2d 901, 907 (1990) (emphasis added).

13. It is and has been a well-settled rule of law that "[e]xcept for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." *Barker v. Fox*, 160 W.Va. 749, 750, 238 S.E.2d 235, 236 (1977); *Pinson*, 181 W. Va. at 665–66, 383 S.E.2d at 847–48. "Absent a showing of fraud, an examination of the evidence presented to the grand jury would not be in the interests of the efficient administration of justice nor the maintenance of the integrity of the grand jury system." *Barker*, 160 W.Va. at 751-52, 238 S.E.2d at 649-50; *Pinson*, 181 W. Va. at 666, 383 S.E.2d at 848.

14. In *State v. Messer*, 223 W. Va. 197, 672 S.E.2d 333, the Appellant appealed to the Supreme Court of Appeals of West Virginia an order of the Circuit Court of Mingo County denying the Appellant a new trial subsequent to a jury verdict finding the Appellant guilty of two counts of first-degree murder with recommendations of mercy. The Appellant claimed a due process violation in the failure of the prosecution to present exculpatory evidence to the

58

grand jury. The Supreme Court of Appeals of West Virginia found "no merit to the Appellant's contention regarding any inadequacy in the presentation of evidence to the grand jury," and held that:

> The United States Supreme Court declined to impose a duty upon prosecutors to disclose exculpatory evidence in *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), finding that a rule requiring prosecutors to present exculpatory evidence in addition to incriminating evidence "would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." 504 U.S. at 51, 112 S.Ct. 1735. Likewise, in *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996), this Court, citing *Williams*, found no merit to a defendant's contention that the grand jury was not provided with exculpatory evidence. 197 W.Va. at 596 n. 5, 476 S.E.2d at 543 n. 5.
>
> *Id.*, 223 W. Va. at 205, 672 S.E.2d at 341.

15. Similarly, in the case *sub judice* the proof necessary to obtain a grand jury indictment is that the State must prove that there is probable cause to believe that the crimes alleged were committed by Petitioner, not proof of Petitioner's guilt beyond a reasonable doubt. Petitioner's contention that favorable evidence was constructively blocked by the prosecution is clearly not supported by state or federal law and is without any meirt, because the Supreme Court of Appeals of West Virginia has reiterated the United States Supreme Court's ruling to decline to impose any duty upon prosecutors to disclose exculpatory evidence before a grand jury. *Id.* Further, Petitioner has not alleged any extraordinary circumstances or fraud that would "permit the [C]ourt to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." *Pinson,* 181 W. Va. at 665–66, 383 S.E.2d at 847–48. Therefore, the Court concludes that Petitioner is clearly not entitled to any relief as to Ground One.

16. In Ground Ten, Petitioner alleges that "the prosecution abused its discretion by failing to properly preserve the crime scene, properly collect the crime scene evidence, and by mishandling purported evidence." Petitioner further alleges that "the off-duty State police officer[3], first on scene was related to the victims and he may well have destroyed evidence, hid [sic] evidence, or even disguised the facts and corrupted the crime scene; there is a break in the chain of custody of some of the evidence and the crime scene was a chaotic mess which denied Petitioner the right to evidence favorable to his defense." Petitioner argues that

---

[3] The facts herein found clearly show that the state police officer in question never went to the crime scene on May 28, 2007. Further, said officer, the found facts show, was not related to any victims.

he was denied a fair trial with reliable results due to said alleged and very speculative prosecutorial mishandling evidence.

17. Regarding the State's duty to preserve evidence and the criminal defendant's constitutional due process right in a criminal case, the Supreme Court of Appeals of West Virginia has recognized that "relying upon *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Defendant has a constitutional due process right to discover and to examine evidence that would tend to exculpate him or could be used for impeachment purposes." *State ex rel. Games-Neely v. Overington*, 230 W. Va. 739, 749, 742 S.E.2d 427, 437 (2013). *See also Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request.").

18. In *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999), the Supreme Court of the United States further wrote that:

> There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

19. The Supreme Court of Appeals of West Virginia "has incorporated into West Virginia jurisprudence the principles set forth in *Brady* and *Agurs*." *State v. Salmons*, 203 W.Va. 561, 572, 509 S.E.2d 842, 853 (1998), and held that:

> We do so today and hold that there are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial.

*State v. Youngblood*, 221 W. Va. 20, 29, 650 S.E.2d 119, 128 (2007).

20. In *Youngblood*, the Supreme Court of Appeals of West Virginia further specified that "a police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor.

60

Therefore, a prosecutor's disclosure duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor." *Youngblood,* 221 W. Va. at 26, 650 S.E.2d at 125; *see also State v. Farris,* 221 W.Va. 676, 656 S.E.2d 121 (2007).

21. The Supreme Court of Appeals of West Virginia has also recognized, along with the United States Supreme Court, that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *State v. Osakalumi,* 194 W. Va. 758, 764, 461 S.E.2d 504, 510 (1995) (citing *Arizona v. Youngblood,* 488 U.S. 51, 57-58 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)).

22. The Supreme Court of Appeals of West Virginia has provided the following standard regarding whether the failure to preserve evidence is violative of a petitioner's rights, Due Process or otherwise:

> **When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production,** a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material: and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available: and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

*State v. Osakalumi,* 194 W. Va. at 766, 461 S.E.2d at 512 (emphasis added).

23. In *State ex rel. Plants v. Webster,* 232 W. Va. 700, 753 S.E.2d 753 (2012), Petitioner, Mark Plants, then Kanawha County Prosecuting Attorney, sought a writ of prohibition in the Supreme Court of Appeals of West Virginia to challenge a March 8, 2012, ruling of the Circuit Court of Kanawha County barring the introduction of certain shell casings found at a crime scene and firearms and ammunition seized from a residence associated with the criminal defendant. The evidence was suppressed as a sanction for the State's admitted failure to make the shell casings available to the defense for inspection and possible testing. *Id.,* 232 W. Va., at 702, 753 S.E.2d, at 755. The Supreme Court of Appeals of West Virginia granted

61

the requested writ and prohibited the enforcement of the aforementioned May 29, 2012, Order which excluded the shell casings from evidence. The Supreme Court of Appeal of West Virginia reasoned, in relevant part, that:

At issue is the ruling of the circuit court regarding the sanctions imposed against the State as a result of the State's failure to comply with discovery requests in a criminal proceeding. The State does not argue that the discovery requests were improper; it appears that all along the State recognized that it had a duty to disclose the items requested by respondent Kinney and also to maintain the safety and integrity of this physical evidence. The ruling was in response to a motion to dismiss the indictment, or in the alternative, to suppress the evidence that had been kept from respondent Kinney's inspection, testing and view. As authority for the ruling, the circuit court relied upon *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995).... **We note from the outset that our holdings in *Osakalumi* upon which the circuit court based its findings and conclusions, are not applicable to the facts in the case at bar. *Osakalumi* dealt with lost evidence. In the *sub judice*, the evidence was not lost but was merely misfiled or misplaced.** We believe the correct focus of the circuit court's inquiry should have started with our holdings in *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 454 S.E.2d 427 (1994), which established a standard for analyzing and reviewing discovery abuses in criminal cases, including the failure to comply with previously ordered discovery requests on the part of a criminal defendant.

*Id.*, 232 W. Va., at 705-6, 753 S.E.2d., at 758-9 (emphasis added).

24. In *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 454 S.E.2d 427 (1994), the Supreme Court of Appeals of West Virginia held that:

While discovery has not been elevated to a constitutional dimension, it is clear that constitutional rights of a criminal defendant are implicated when a discovery system has been put in place and **the prosecution fails to comply with court ordered discovery.** We believe that it is necessary in most criminal cases for the State to share its information with the defendant if a fair trial is to result. Furthermore, we find that complete and reasonable discovery is normally in the best interest of the public.

*Id.*, 193 W.Va. at 139, 454 S.E.2d at 433.

25. As our High Court has noted that a claim in a habeas proceeding must have constitutional or jurisdictional underpinnings. W. Va. Code § 53–4A–1; *Pethel*, 219 W.Va. at 589, 638 S.E.2d at 738. The writ of habeas corpus is designed to remedy a violation of the rights and protections afforded an accused by both the West Virginia Constitution and the United States Constitution. *Id.* The right to relief afforded by the writ of habeas corpus is therefore limited. *Id.* at 588, 638 S.E.2d at 737. In addition to establishing a constitutional violation, a habeas petitioner must establish that his contention has merit; relief will not be granted in habeas for

62

claims which are merely speculative or undeveloped by a petitioner and not adequately supported by the record. *See Markley v. Coleman*, 215 W. Va. 729, 734, 601 S.E.2d 49, 54 (2004). "A petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release," Syl. Pt. 1, *Scott v. Boles,* 150 W. Va. 453, 147 S.E.2d 486, and "a skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." *State ex rel. Hatcher v. McBride,* 221 W. Va. 760, 766, 656 S.E.2d 789, 795 (2007).

26. in the case *sub judice*, Petitioner's allegations regarding the State's alleged failure to properly preserve the crime scene, collect evidence, and preserve the chain of custody of some of the evidence, arc mere speculative assertions of constitutional claims unsupported by any facts and/or law. Petitioner fails to carry the burden of showing what evidence was mishandled by the State, or what evidence was deficient or lacking in the chain of custody of physical evidence. The undersigned Judge, who tried the underlying criminal case, has carefully and thoroughly reviewed the trial transcripts in the case *sub judice* and finds that nothing in Petitioner's underlying criminal case, remotely indicate that the State ever engaged in any bad faith conduct, "lost evidence," or failed to comply with any court ordered or defense required discovery, which would constitute violations reviewable in a habeas corpus proceeding. In fact, the record clearly shows that the State had, both prior to and during the trial, provided Petitioner all the discoverable information and evidence requested by Petitioner's defense counsel. The Court concludes that Petitioner's Ground Ten is wholly unfounded and without merit.

27. Petitioner alleges twelve (12) Grounds (Grounds Six, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, and Twenty-Two) claiming that the trial court abused its direction in the handling of his criminal case.

28. In Ground Six, Petitioner alleges that "the trial court failed to grant a change of venue based upon excessive pre-trial publicity and possible jury intimidation by family members of the victims."

29. Rule 18 of the West Virginia Rules of Criminal Procedure states: "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a county in which the offense was committed." W. Va. R. Crim. P. 18. The records of Petitioner's underlying criminal case show, without question, that the triple murders were committed by Petitioner in

63

Fayette County, West Virginia. Therefore, the venue was proper in Fayette County, West Virginia Circuit Court.

30. Rule 21(a) of the West Virginia Rules of Criminal Procedure states: "[t]he circuit court upon motion of the defendant shall transfer the proceedings as to that defendant to another county if the circuit court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial at the place fixed by law for holding the trial. W. Va. R. Crim. P. 21(a).

31. The Supreme Court of Appeals of West Virginia has long held that the applicable standard to determine whether a change of venue was necessary is as follows:

> To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.

*State v. Black*, 227 W.Va. 297, 310-11, 708 S.E.2d 491, 504-505 (2010).

32. The Supreme Court of Appeals of West Virginia has also held that:

> In *State v. Pratt*, W.Va., 244 S.E.2d 227 (1978), this Court held that widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial. In other words the defendant must show that he cannot get a fair trial because of the existence of extensive present hostile sentiment. In *State v. Boyd*, W.Va., 280 S.E.2d 669 (1981), we discussed the requirements announced in *Pratt* and explained that the inquiry as to whether a defendant has established good cause for change of venue is not focused on the amount of pre-trial publicity, but on whether the publicity has so pervaded the populace of the county as to preclude a fair trial. Whether a change of venue is warranted rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed, unless it clearly appears that such discretion has been abused.

*State v. Gangwer*, 169 W. Va. 177, 180–81, 286 S.E.2d 389, 392–93 (1982).

33. Further, the Supreme Court of Appeals of West Virginia gave the following further guidance:

> while "[a] change of venue will be granted in West Virginia when it is shown that there is 'a present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial ...,'" syllabus point 1, *State v. Peacher*, W.Va., 280 S.E.2d 559 (1981) (quoting syllabus point 1, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)), the mere existence of pretrial publicity concerning the alleged offense is insufficient to warrant a change of venue. Rather, the publicity must be shown to have so pervaded the populace of the

county in such a manner as to preclude a fair trial. *See State v. Boyd*, W.Va., 280 S.E.2d 669 (1981). *See also State v. Goodmon*, W.Va., 290 S.E.2d 260 (1981). *State v. Young*, 173 W. Va. 1, 9–10, 311 S.E.2d 118, 127 (1983).

34. Petitioner's claim that the trial court erred by failing to grant a change of venue is wholly without any merit. The undersigned Judge, having presided in the underlying criminal case, in addition to having reviewed the trial transcripts and entire court file in the case *sub judice*, concludes that there were no compelling reasons whatsoever which would have merited or necessitated a change of venue. Moreover, the trial transcripts clearly show that the Court extensively and separately questioned each of the prospective jurors as to whether they were prejudiced by any type of media coverage, and each replied negatively. If the mere fact that a criminal case may have received some media coverage was sufficient justification to grant a change of venue motion, virtually no felony criminal cases would ever be tried in the county in which crimes were alleged to have been committed. Further, in Petitioner's underlying criminal case, Petitioner, by counsel, on September 20, 2007, filed "Motion for Change of Venue," alleging only that the venue of this case should be changed, because "the [Petitioner's] family has been threatened by numerous people, ... the [Petitioner's] house was burned down, presumably by relatives of the deceased" due to the triple homicide allegedly committed by Petitioner, and "no amount of security can assure and insure the reasonable safety of the [Petitioner], his family, his witnesses, his counsel, and perhaps the Court officers in a trial and other court proceedings in Fayette County." Petitioner did not raise in his motion or in oral argument any "widespread publicity" arguments to support or necessitate a change venue. Nor did Petitioner raise the issue of changing venue due to "widespread publicity" in his failed direct appeal. The trial transcript in this case clearly demonstrates that the undersigned Judge took very careful, thorough, fair and time-consuming efforts to, during *voir dire*, make certain, insofar as it was humanly possible, that Petitioner was tried before a jury that was fair and impartial. Thus, the relief sought in Grounds Six is wholly without any factual or legal merit and has also been waived.

35. In Ground Eleven, Petitioner alleges that "Petitioner was denied Due Process and Equal Protection of law where the Court abused its discretion failing to prove a sufficient and complete chain of custody of the evidence submitted at trial." Particularly, Petitioner claims that the trial court improperly admitted evidence of "a clip, a set of shooting glasses, a green bandana and a blue rag that had blood on it," found by Carl Blaine Cox, Sr., father of victim

65

Cox, on May 29, 2007, the day after the shooting. (Trial Transcript, Vol. II. p 438), because no proper foundation, or chain of custody was established.

36. In order to prevail on an issue previously adjudicated during the criminal proceeding, Petitioner must prove that the trial court's ruling is "clearly wrong". W. Va.Code § 53–4A–1(b).

37. "There is a strong presumption in favor of the regularity of court proceedings and the burden is on the person who alleges irregularity to show affirmatively that such irregularity existed." Syl. Pt. 2, *Scott v. Boles*, 150 W. Va. 453, 147 S.E.2d 486.

38. Due to this strong presumption of regularity, statutory law requires that a petition for writ of habeas corpus shall "specifically set forth the contention or contentions and grounds in fact or law in support thereof upon which the petition is based[.]" W. Va.Code § 53–4A–2.

39. With respect to claims involving a trial court's admissibility of evidence raised in habeas petitions, the Supreme Court of Appeals of West Virginia has held that "evidentiary rulings fall within the gambit of ordinary trial error," and will not be reviewed in a habeas corpus proceeding. *Hilling v. Nohe*, No. 12-0131, 2013 WL 3185089, at *5 (W. Va. June 24, 2013); *McMannis v. Mohn*, 163 W. Va. at 137, 254 S.E.2d at 809. The Supreme Court of Appeals of West Virginia has explained that:

> Absent "circumstances impugning fundamental fairness or infringing specific constitutional protections," admissibility of evidence does not present a state or federal constitutional question. *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960); *see also Howard v. Moore*, 131 F.3d 399, 415 n. 18 (4th Cir.1997) (state evidentiary rulings are not cognizable in habeas corpus unless shown to violate fundamental fairness).
> State court evidentiary rulings respecting the admission of evidence are cognizable in habeas corpus only to the extent they violate specific constitutional provisions or are so egregious as to render the entire trial fundamentally unfair and thereby violate due process under the Fourteenth Amendment. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir.1993); *Howard v. Moore, supra; Burket v. Angelone*, 208 F.3d 172, 186 (2000).
>
> *Hatcher v. McBride*, 221 W. Va. at 11, 650 S.E.2d at 110.

40. In *State ex rel. Farmer v. McBride*, 224 W. Va. 469, 480, 686 S.E.2d 609, 620 (2009), the Supreme Court of Appeals of West Virginia found that:

> In this case, six of the grounds for relief asserted by the appellant involve alleged trial error. Having carefully and thoroughly reviewed the record in this case, this Court finds that four of those grounds are not subject to habeas review. In

66

particular, **this Court finds that the following are ordinary trial errors:** denying the appellant's motions for acquittal at the close of the State's case, **admitting into evidence the appellant's t-shirt which contained evidence of seminal fluid,** allowing the jury to use a magnifying glass, and finding that the prosecutor did not knowingly introduce false testimony of three witnesses, David Tomlin, James Lang, and Lynn Fitzwater. Even if these alleged trial errors were supported by the record, this Court does not believe that they implicate the appellant's constitutional rights in such a manner as to be reviewable in habeas corpus, and therefore, they will not be addressed. *State ex rel. Wimmer v. Trent,* 199 W.Va. 644, 487 S.E.2d 302 (1997).

(emphasis added).

41. Similarly, in the case *sub judice,* the aforementioned allegations in Petitioner's Ground Twelve invoke allegations of ordinary trial error and does not constitute violations reviewable in a habeas corpus proceeding. *Hilling v. Nohe,* No. 12-0131, 2013 WL 3185089, at *5. Moreover, Petitioner has failed to explain how these purported and speculative trial errors were so egregious and pervasive such as to contaminate his entire jury trial. Therefore, it bears reiteration that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, *McMannis v. Mohn,* 163 W. Va. 129, 254 S.E.2d 805.

42. Thus, the Court concludes, based on clearly established law and the facts within the trial transcript and found herein, that no error was committed by the Court's admitting any of the State's proffered evidence into evidence.

43. In Ground Twenty-Two, Petitioner alleges that the three (3) Penitentiary sentences imposed by the trial court should have been ordered served concurrently, rather than consecutively, because of the jury's recommendation of mercy.

44. The sentencing court is given broad discretion in imposing sentence, as long as sentences are within the statutory limits and not based on any impermissible factor. *State ex rel. Massey v. Hun.* 197 W. Va. 729, 478 S.E.2d 579 (1996) (a trial court's discretion when imposing a sentence is broad, and as long as the sentence is within statutory limits and is not based on some impermissible factor, it is not subject to appellate review). Regarding the imposition of consecutive sentences, the Supreme Court of Appeals of West Virginia has held that "'[w]hen a defendant has been convicted of two separate crimes, before sentence is pronounced for either, the trial court may, in its discretion, provide that the sentences run concurrently, and unless it does so provide, the sentences will run consecutively.' Syllabus

point 3, *Keith v. Leverette*. 163 W.Va. 98, 254 S.E.2d 700 (1979)." Syl. Pt. 3, *State v. Allen*. 208 W.Va. 144, 539 S.E.2d 87 (1999). W.Va. Code §61-11-21 provides that sentences for two or more criminal convictions shall be served consecutively unless the sentencing court orders the sentences to be served concurrently.

45. In the case *sub judice*, the trial court's imposition of consecutive sentences for Petitioner's felony convictions of two counts of murder in the first degree, with mercy, and one count of murder in the second degree, complied with the provisions of W. Va. Code § 61-11-21, W. Va. Code §§ 61-2-2, 61-2-3, 62-3-15, and the Supreme Court's holding in *State v. Alien*. *supra*. The trial court did not frustrate the jury's two (2) mercy recommendations[6], rather, it merely followed the letter of the law, exercised its sound discretion based on the facts of the case and imposed the sentences to be served consecutively. The Court further concludes that the clearly lawful manner in which the Court imposed the aforementioned three (3) sentences in Petitioner's underlying criminal case, was the appropriate exercise of the Court's discretion considering the very deliberate, viscious, brutal, and malicious manner in which three (3) young human beings were killed. The record is plain that Petitioner is not entitled to any relief as to the allegation in Ground Twenty-Two.

46. Petitioner raises nine (9) grounds for habeas relief claiming that the trial jury was not properly instructed by the Court as to the law regarding the element of "shifting the burden of proof" in his underlying criminal case as follows: (1) Ground Twelve: "The trial court gave an incorrect, burden shifting element instruction for voluntary manslaughter in the case of Mr. Dustin Hughes which also omitted a necessary element, denying Petitioner due process and equal protection of law;" (2) Ground Thirteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Dustin Hughes, which also omitted a necessary element, denying Petitioner due process and equal protection of law;" (3) Ground Fourteen: "The trial court gave an incorrect burden shifting element instruction for first degree murder in the case of Mr. Dustin T. Hughes, which also omitted two necessary elements denying Petitioner due process and equal protection of law;" (4) Ground Fifteen: "The trial court gave an incorrect burden shifting element instruction when instructing for voluntary manslaughter in the case of Mr.

---

[6] The mercy recommendations made by the jury concern the Petitioner's ability to, at some future point, seek parole, an executive matter.

68

Christopher L. Legg, denying Petitioner due process and equal protection of law;" (5) Ground Sixteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Christopher L. Legg, which also omitted a necessary element denying Petitioner due process and equal protection of law;" (6) Ground Seventeen: "The trial court gave an elementally incorrect instruction when instructing for first-degree murder in the case of Mr. Christopher L. Legg, which also omitted two necessary elements denying Petitioner due process and equal protection of law;" (7) Ground Eighteen: The trial court gave an incorrect burden shifting element instruction when instructing for voluntary manslaughter in the case of Mr. Carl B. Cox, Jr., denying Petitioner due process and equal protection of law;" (8) Ground Nineteen: "The trial court gave an incorrect burden shifting element instruction when instructing for second-degree murder in the case of Mr. Carl b. Cox, Jr.,, which also omitted a necessary element denying Petitioner due process and equal protection of law;" and (9) Ground Twenty: The trial court gave an incorrect burden shifting element instruction when instructing for first degree murder in the Case of Mr. Carl B. Cox, Jr., which also omitted two necessary elements denying Petitioner due process and equal protection of law."

47. A review of the contents of the court file in Petitioner's underling criminal case, which contains the actual written jury charge and instructions of law, which the Court read to the jury, and the trial transcripts leads the Court to conclude that the Court's general jury charge, the Court's individual jury instructions and the jury verdict form the Court provided to the jury were, in the case *sub judice*, all of regular and standard form and contents in regard to their legal correctness and legal content. The same, or very closely similar, types of documents and the contents thereof are routinely used in criminal jury trials throughout all of the judicial circuits in West Virginia. Also, the Court concludes that there were no burden shifting aspects in any of the courts instructions of law[7].

48. The Supreme Court of Appeals of West Virginia has held that:

This Court is unwilling to find error in failing to instruct the jury that it may not infer malice where the circumstances provide evidence of legal excuse,

---

[7] The Count notes that, as is it's practice and custom, it provided to the defense and the State. in advance of the trial, copies of the Court's proposed general jury charge, instructions of law and verdict forms. At the portion of the trial where the Court reviewed with all counsel, in the anteroom and on the record, the instructions of law and charge the Court would read to the jury there were no objections by any counsel nor did any counsel. offer their proposed instructions of law.

69

justification or provocation where there was no such evidence for the jury to consider. Even if we were to accept Appellant's argument that Jury Instruction No. 6 **improperly shifted the burden of proof as to the element of malice, habeas corpus relief is not warranted. If an improper burden shifting had occurred, the same would constitute harmless error where ample evidence of malice exists on the record for the jury's consideration.**

*State ex rel. Corbin v. Haines*, 218 W. Va. 315, 322, 624 S.E.2d 752, 759 (2005).

49. Accordingly, Petitioner's aforementioned Grounds Twelve to Twenty are without merit both factually and as to the law, because they are not claims of a constitutional dimension and thus not appropriate for consideration under habeas corpus.

50. In the case *sub judice,* Petitioner raised eight (8) Grounds claiming ineffective assistance of counsel.

51. The Sixth Amendment to the United States Constitution and Article III, § 14 of the West Virginia Constitution not only assure the "assistance of counsel" to a defendant in a criminal proceeding but also assure that such a defendant receive competent and effective assistance of counsel. *State ex rel. Strogen v. Trent,* 196 W.Va. 148, 152, 469 S.E.2d 7, 11 (1996); *see also Cole v. White,* 180 W.Va., 393, 395, 376 S.E.2d 599, 601 (1988). "In the West Virginia courts, claims of ineffective, assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995).

52. A court is not required to address both prongs of the *Strickland/Miller* test if it can dispose of ineffective assistance of counsel claims on the failure to meet either prong of the test. *State ex rel. Daniel v. Legursky,* 195 W.Va. 314, 465 S.E.2d 416 (1995).

53. The Supreme Court of Appeals of West Virginia has also held that:

**A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden** because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

70

*State v. Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 (emphasis added).

54. "Where counsel's performance, attacked as ineffective arises from occurrences involving strategy, tactics, and arguable courses of action, his conduct will be deemed effectively assistive of his client's interest, unless no reasonably qualified defense attorney would have so acted in the defense of the accused." Syl. Pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). *See also* Syl. Pt. 5, *State ex rel Humphries v. McBride*, 220 W.Va. 362, 645 S.E.2d 798 (2007).

55. Further, the Supreme Court of Appeals of West Virginia has given the following further guidance:

> The fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about how best to represent criminal clients. Thus, the presumption is simply inappropriate if counsel's strategic decisions are made after an inadequate investigation.
>
> In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, this Court will not view counsel's conduct through the lens of hindsight Courts are to avoid the use of hindsight to elevate a possible mistake into a deficiency of constitutional proportion. Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his or her choices.

*Daniels v. Legursky*, 195 W.Va. at 320, 465 S.E.2d at 422.

56. Accordingly, in reviewing defense trial counsel's performance, courts must apply a highly deferential standard to the wide range of acceptable professional assistance provided the Inmate Petitioner during his jury trial and refrain from engaging in, hindsight or second-guessing of defense counsel's strategic decisions. *Id.*

57. In Ground Two, Petitioner claims that trial counsel failed to raise to the Court's attention and request a pre-trial psychological evaluation of Petitioner when it was allegedly known that Petitioner likely may have suffered post-traumatic stress disorder at the time the crimes were committed and at the time of the jury trial.

58. The record of Petitioner's underlying criminal case, shows that the Court entered a Transport Order on March 3, 2008, which, in relevant part, stated:

Petitioner by counsel advised the Court that they desire a psychiatric evaluation to be performed on Petitioner and have contacted the office of Bobby Miller, M.D. of 916 6th Avenue, Huntington, WV 25701 about conducting the same. The Court ordered that the defendant's counsel shall notify the administration of the South-central Regional Jail Authority at least 48 hours prior to the scheduled appointment and that, with such notification, the Regional Jail Authority shall cause the defendant to be transported to and from his appointment with the above psychiatrist.

59. The aforementioned Presentence Investigation Report, in the Petitioner's underlying criminal case, clearly stated that Petitioner **"denies being referred to or seeking out any mental health, psychiatric or substance abuse treatment presently or in the past."** (Presentence Investigation Report, Indictment No. 07-F-159, p 7) (emphasis added). The aforementioned Presentence Investigation Report also stated that Petitioner, who "has never enlisted in the United States Armed Forces," "was employed through the West Virginia Department of Highways from 1970 to 1973," and "retired from Pittston Coal Company in 2002 after 21 years of service." (*Id.*, p 6). In addition, the aforementioned twenty-one (21) notarized letters written on behalf on Petitioner in support of his being released on bond also clearly support the finding that Petitioner was competent and free of any alleged stress or psychiatric disorder at the time of the crimes and at the time of the jury trial. Thus, considering all of the aforementioned, it is obvious that the very experienced criminal trial defense counsel, over all, had no reason to be concerned about their client's mental competency or his ability to aid and assist them in their defense of him in the jury trial.

60. The record is clear that Petitioner's trial counsel did take reasonable steps to investigate Petitioner's purported psychiatric conditions. It is obvious that Petitioner's counsel did not find it necessary to use the herein described Transport Order. The Court concludes that Petitioner's Ground Two is without merit and lacks any factual basis.

61. In Ground Three, Petitioner claims that "trial counsel did not request a continuance to permit Petitioner to have his competence as to his ability to stand trial in the first place, and to see if his competence could be restored for trial." In Ground Eight, Petitioner claims that his trial counsel failed to raise to the Court that Petitioner was unable to hear all of counsels questions, misunderstood many questions, could not effectively communicate with counsel without his medically proscribed hearing aids which were destroyed when Petitioner's home burned two (2) days after his arrest for three (3) murders.

72

62. Petitioner's Grounds Three and Eight refer to trial counsel's duty to perform pre-trial investigation. The Supreme Court of Appeals of West Virginia has held that "[t]o be competent to stand trial, a defendant must exhibit a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational, as well as factual, understanding of the proceedings against him." Syl. Pt. 1, *State v. Cheshire*, 173 W.Va. 123, 313 S.E.2d 61 (1984); *State ex rel. Williams v. Narick*, 164 W.Va. 632, 264 S.E.2d 851, 857 (1980). Counsel are under an obligation to undertake reasonable pre-trial investigation of possible mental defenses where there are indications that a defendant suffers from a significant mental defect. *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 18, 528 S.E.2d 207, 214 (1999).

63. The Supreme Court of Appeals of West Virginia identified several factors in determining competency:

> Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his discretion.

Syl. Pt. 55, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (1975); *State v. Cheshire*, 173 W. Va. at 125, 313 S.E.2d at 63).

64. The trial court, having presided over the aforementioned Petitioner's underlying criminal case from arraignment, pre-trial hearings, jury trial and sentencing, observed that Petitioner always responded quite appropriately to the Court's questions and at times consulted with his counsel before answering the Court. The transcript of Petitioner's underlying jury trial shows that he testified that he was "half deaf" in his hearing ability (Trial Transcript, Vol. III, p 712). From arraignment through sentencing in Petitioner's underlying criminal case, neither Petitioner, nor his counsel, ever requested any hearing assistance devices. Further, upon review of the transcripts in Petitioner's underlying criminal case, the Court concludes that Petitioner obviously had no trouble understanding the Court's questions, understanding his counsel's answers, or communicating with his counsel.

> The Court: **you are Gary D. Martin, sir?**
> The Defendant/Petitioner: **Yes, sir.**
> The Court: All right, sir, you are here with your lawyer, Ed, Rebrook. Correct?
> The Defendant: Yes, sir, that's correct.
> The Court: Mr. Martin, the Fayette County Grand Jury, sitting at its September term, has returned as to [sic] three count indictment against Gary D. Martin. It is

73

Indictment 01-F-159. ... Are you the same Gary D. Martin named within this indictment, sir?

The Defendant: Yes, sir.

Mr. Rebrook: I have explained to Mr. Martin that he has a right to be tried in the term in which he was indicted. I also explained to Mr. Martin that Mr. Clifford and I have another huge murder trial we're working on right now in Putnam County before Judge Glosky [sic] that starts December, the very first week of December. I told Mr. Martin because of the severity of his crime, the number of victims, number of potential witnesses, we would ask to move this matter into your January term.

The Court: I'll question the Defendant now about that. I'll take your motion under advisement... Mr. Martin, do you understand that you have the right, by constitution, to a speedy trial, that is to have this case tried on [on [Friday, November 30, 2007, at 9:00 a.m.,] I just announced or sooner. Do you understand that?

The Defendant: Uh-huh.

The Court: You have to answer loud.

The Defendant: Yes, sir.

The Court: And Mr. Rebrook says that he and his associate, Mr. Clifford, who are your lawyers... need more time to work with you and investigate your case and study all of the documents, whatever it is the State will give them, and that he would not be sufficiently ready on, in November to try your case. Do you agree with that?

The Defendant: Yes, sir.

Indictment No. 07-F-159 Arraignment and Motions Hearing Transcript, pp 2-8 (emphasis added).

65. At the time of Petitioner's jury trial, the undersigned Judge had approximately seventeen (17) years' experience as a trial judge. Using that large amount of experience the trial judge was able to, and did, carefully pay precise and particular attention to each and every aspect of Petitioner's jury trial. The jury trial transcripts and the above findings of fact clearly show that Petitioner unhesitatingly and categorically admitted to the first people to arrive at the crime scene, to law enforcement interviewers, and to jurors during his trial testimony that, as the three (3) victims were in a public highway, he unhesitatingly shot and killed the three (3) young, male victims. Petitioner, during this trial testimony, gave very firm and convincing testimony that he was more than casually familiar with the proper operations of the murder weapon, an AK 47 semi-automatic assault rifle, which he had purchased for his son. The evidence presented at trial clearly showed that the three (3) murder victims had only one firearm, a Glock semiautomatic pistol, among them, and that it had been damaged and disabled by Petitioner shooting one of the victims, while the pistol was yet in a hip holster

74

worn by one of the victims. The only other weapon possessed among the three (3) victims was one (1) machete or knife, which was found, after the shooting, securely fastened to one (1) of the two (2) four wheelers by plastic zip ties, which ties would have had to be cut to gain access to the machete. There was no evidence during the trial that any physical altercation occurred between Petitioner, his son, or any of the three victims. The evidence at trial clearly showed that, prior to Petitioner shooting the victims, there was no physical contact of any kind among Petitioner, his son or any of the victims. The evidence at trial showed that at no time during the alleged argument did Petitioner or his son retreat at all from the public highway, nor did the victims come on to Petitioner's land. Thus, considering all of the evidence presented and admitted during Petitioner's jury trial. in a light most favorable to Petitioner, it is unquestionably and abundantly clear that twelve (12) reasonable and impartial jurors unanimously could and did, after more than two (2) hours deliberation, conclude that the State of West Virginia had proved, beyond a reasonable doubt, that self-defense was not presented in the case, and that the evidence clearly showed, beyond a reasonable doubt, that Petitioner was guilty of the crimes charged and as set forth in the juries three (3) unanimous verdicts.

66. Petitioner was represented by two (2) defense trial lawyers of his and his families own choosing. Mr. Rebrook and Mr. Clifford were then, and yet are, possessed of reputations within the legal community as very competent, effective, vigorous, skilled, experienced and often-winning defense trial lawyers in southern West Virginia. Based on all of the evidence, admitted in Petitioner's case, including the jury view of the crime scene, no other criminal defense attorney could have performed any better or more successfully than these two defense lawyers, nor could have any other defense lawyers obtained any different or more favorable jury verdicts in Petitioner's case, no matter where in West Virginia they might have tried Petitioner's case to a jury.

67. In careful consideration of all of the facts in the case *sub judice*, and the law applicable thereto, the Court concludes that our nation's long established adversarial process worked quite fairly and adequately in Petitioner's case.

68. The undersigned Judge at this writing has been on the Bench for twenty-six (26) years and has presided over many jury trials wherein the crimes charged were murder by a variety of different methods and means. The results were, from time to time, hung juries, not guilty

75

verdicts, guilty verdicts, and Court granted motions for judgment of acquittal. In said cases there were many complicated issues, both plain, uncomplicated facts as well as complicated facts and complicated scientific and medical issues. The case *sub judice* is one wherein there were no unusual, surprising or complicated issues or evidence. At no time during Petitioner's case, pretrial, trial or post-trial did he ever, in court, display the slightest evidence of any auditory or visual problems. He never asked that questions be repeated and he never claimed that he could not hear or understand anything that was happening in his case. The jury trial, for all practical purposes, had only one expert witness and that was Dr. Kaplan, a well-trained and much experienced forensic pathologist who served for many years as West Virginia's Chief Medical Examiner. The sum total of his testimony, both direct and cross-examination, was basically to describe gunshot wounds and describe the manner of death as to the three (3) dead victims. Throughout the entire two (2) day jury trial there never appeared to be any doubt about who shot the victims, the locations of the shooting, where the bullets struck the victims or when they were shot. Also, there was never any reasonable or viable evidence presented which remotely established any facts that Petitioner shot the victims in the exercise of his right of self-defense.

69. Further, the Court has considered the factors which the Supreme Court of Appeals of West Virginia identified in determining competency in *Arnold,* and neither observed nor found any evidence of any irrational behavior other than the commission of the three violent crimes, and found no history of any mental illness, either in Petitioner or his immediate family. Consequently, the Court concludes that Petitioner's Grounds Three and Eight clearly lack any factual or legal basis and are without merit.

70. In Ground Five, Petitioner alleges that defense counsel were ineffective in conducting *voir dire* of the prospective jurors and sitting jurors in this case, ... and but for their shortcoming in *voir dire,* the results of the jury trial would have been different.

71. The right to an impartial and objective jury is a fundamental right. The Supreme Court of Appeals of West Virginia held that "[t]he right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III,. Section 14, of the West Virginia Constitution. A meaningful and effective *voir dire* of the jury panel is necessary to effectuate that fundamental right." Syl. Pt 4, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981).

72. The purpose of *voir dire* is to obtain a panel of jurors free from bias or prejudice. *State v. Harshburger*, 170 W.Va. 401, 294 S.E.2d 254, 256 (1982). "The relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant." *State v. Miller*, 197 W.Va. at 605, 476 S.E.2d at 552. "Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." *Id.*

73. The record of Petitioner's underlying criminal case shows that on April 1, 2008, Petitioner, by counsel, filed a document captioned "Jury Questionnaire," which contained 30 proposed questions for prospective jurors. During *voir dire*, Petitioner's trial counsel moved to strike any prospective jurors who indicated they might have any bias, and the Court granted Petitioner's motions if cause was shown.

74. The Court concludes that there is no indication that a reasonably prudent and competent attorney would have inquired further into prospective jurors' possible hostilities and sentiments and the conduct of Petitioner's trial counsel, without question, falls within the wide range of reasonable, professional assistance set forth in *Legursky*.

75. As clearly shown in the trial transcript and the above findings of fact, it is quite clear that in Petitioner's aforementioned underlying criminal case, defense counsel, State's counsel and especially the trial court, conducted very detailed, thorough, and extensive *voir dire* examination of the prospective jurors. The findings of fact herein and the trial transcript unquestionably shows that the trial court eliminated any prospective juror who gave even a slight hint that they might be unable, or for whatever reason, could not be a fair and impartial juror. The Court specifically inquired whether any of the prospective jurors had any knowledge regarding the facts of the case, and, if so, the nature of the knowledge. The Court also extensively and separately questioned each of the prospective jurors as to whether they were prejudiced by media coverage, and each replied negatively. No juror who served as a trial juror or as an alternate juror in Petitioner's case indicated that they would be unable to fairly consider the evidence in the case. No juror indicated that they were biased or prejudiced based upon any recollection of any media accounts of the case. The record clearly shows that a fair and impartial jury was seated in Petitioner's aforementioned underlying criminal case. Petitioner provided no specific allegations of prejudice and points to no

evidence that might bring such prejudice to light, therefore an evidentiary hearing is not necessary on this matter for this Court to conclude that Petitioner's claim in Ground Five is without merit both factually and legally.

76. In Ground Seven, Petitioner claims that trial counsel failed to hire crime scene expert, physical logistics expert, firearms expert and psychologist to refute the State's experts and the State's evidence.

77. Based on the transcripts in Petitioner's underlying criminal case, the Court concludes, without using hindsight, that Petitioner's trial counsel conducted a sufficiently reasonable investigation fulfilling the requirement set forth in *Legursky*. The record shows that Petitioner's trial counsel requested and was provided with discovery by the State. The record clearly shows that Petitioner's trial counsel carefully, competently, and fully examined each and every witness offered by the State as the findings of the fact herein show. Therefore, the Court concludes that trial counsel's decision not to hire experts was clearly neither deficient nor ineffective under any objective standard of reasonableness and the Court declines to embark on a futile journey filled with second-guessing defense counsel's strategic and trial tactics in regard to experts offered by the State. *Miller*, 194 W.Va. at 6–7, 459 S.E.2d at 117–18. The Court further concludes that Petitioner's arguments are grounded in mere speculation and wishful hindsight. Even if Petitioner's trial counsel had employed some experts, there is, based on the trial evidence in this case, neither evidence nor persuasive arguments that the results of Petitioner's jury trial would have been any different. The Court concludes that, based on the facts of the case, there was little, if any, dispute about facts concerning guns or autopsies. Consequently, Petitioner's Ground Seven is without merit.

78. In Ground Nine, Petitioner's claims that his defense counsel failed to adequately prepare him to testify in his own behalf during his jury trial. The record in this case demonstrates that Petitioner's claim must fail in light of the fact that the trial court clearly followed case law and properly informed Petitioner about his right to testify or remain silent. The record reflects that at trial, the Court informed Petitioner, out of hearing of the jury, of his right to testify in his own defense. The above findings of fact and the trial transcripts clearly show the detail with which the trial court told Petitioner his testimonial rights. He was informed that the Court would instruct the jury to weigh and consider Petitioner's testimony the same as other witnesses in the case. Further, the Court informed Petitioner that he had a right to

remain silent at trial and not testify in his own defense, and that the prosecutor would not be permitted to comment to the jury as to Petitioner's silence. The Court also informed Petitioner that the jury would be instructed to not discuss his silence or consider it in their deliberations should he choose to not testify. Petitioner, having been fully informed of his rights, announced, on the record, that he chose to testify. Petitioner also told the trial judge that he was satisfied with his defense counsel. *See* Trial Transcript, Vol. I, pp 247-52; Trial Transcript, Vol. III, pp 628-31. As such, Petitioner's said allegation lacks factual support and is without merit.

79. In Ground Twenty-One, Petitioner claims that his defense counsel failed to recognize and raise the alleged infirmities in the trial court's instructions of law raised in Grounds Twelve to Twenty, heretofore mentioned. The record demonstrates that contrary to Petitioner's claim, Petitioner's trial counsel, on April 22, 2008, orally, at the jury trial, and out of the presence of the jury, moved the Court to dismiss the aforementioned indictment, arguing that the aforementioned indictment "permits an impermissible and unconstitutional shifting of the burden of proof to the defendant in order to receive mercy from the jury." Petitioner's counsel also filed written "Motion to Dismiss" on April 22, 2008. The Court denied said "Motion to Dismiss." *See* Trial Transcript, Vol. III, pp 623-28.

80. All conduct or lack thereof by Petitioner's trial counsel complained of in the aforementioned eight (8) Grounds for ineffective assistance of counsel concern either strategic trial decisions by defense counsel or otherwise and does not rise to the level of ineffective assistance of counsel under the above-quoted standard announced by the United States Supreme Court in *Strickland* and adopted by the Supreme Court of Appeals of West Virginia in *Miller*. Further, a careful reading of the Petition, a careful review of underlying criminal court file, and jury trial transcript all reveal that none of trial counsel's actions or inactions were even remotely of such a kind or character as to overcome the strong presumption that trial counsel's conduct fell well within a reasonable range of professional assistance as described above in *Legursky*.

81. The Court has carefully and very time-consumingly considered Petitioner's twenty-two (22) alleged grounds for relief. The Court has concluded, overwhelmingly, that Petitioner is entitled to no relief because Petitioner's claims are unsupported by Petitioner, the record of Petitioner's underlying criminal case, and the law, both state and federal. In any event,

79

Petitioner is not entitled to any of the relief sought in his Petition under W.Va. Code § 53–4A–1 for a Writ of Habeas Corpus.

82. Applying the entire body of law recognized and set forth in this Order to all of the facts found, can and does lead to only one sound, logical and reasonable conclusion, and that is that Petitioner, in his criminal case, did, without question, receive all viable constitutional and statutory rights to which all criminal defendants are lawfully entitled.

83. The United States Supreme Court has held from March 1953 forward that a criminal defendant is entitled to a fair jury trial, but not a perfect jury trial. *Lutwak v. United States*, 344 U.S. 644, 73 S.Ct. 481 (1953).

Accordingly, it is **ORDERED** that the relief sought by Petitioner be and the same is hereby **DENIED** and said civil action is **DISMISSED**.

**The Clerk shall, forthwith, mail an attested copy of this Order to Inmate Gary D. Martin, Mt. Olive Correctional Complex, One Mountainside Way, Mt. Olive, West Virginia, 25185.**

ENTERED this 17th day of January, 2017.

JOHN W. HATCHER, JR.
CHIEF JUDGE

A TRUE COPY of an order entered
January 17, 2017
Teste: _____
Circuit Clerk Fayette County, WV